[No. B228332. Second Dist., Div. Five. Aug. 3, 2012.]

AXIS SURPLUS INSURANCE COMPANY, Plaintiff and Respondent, v. LINDA REINOSO, Defendant and Appellant.

COUNSEL

Tesser & Ruttenberg, Tesser Ruttenberg & Grossman and Brian M. Grossman for Defendant and Appellant.

Ropers, Majeski, Kohn & Bentley, Allan E. Anderson, Marta B. Arriandiaga and Terry Anastassiou for Plaintiff and Respondent.

OPINION

MOSK, J.—

## INTRODUCTION

We hold there is substantial evidence to support the finding that appellant was not covered by liability insurance in connection with claims brought against her by tenants of an apartment building that she co-owned. We also hold that in connection with the insurer's action against appellant and others to recover the costs of settling those claims, there is substantial evidence to support the trial court's implied allocation to appellant of joint and several liability to the insurer for the amount of the settlement costs paid by the insurer. The benefit to appellant of the settlement justified such an allocation. We therefore affirm the judgment.

## BACKGROUND[1]

Defendant and appellant Linda Reinoso and her husband Edgar Reinoso, owned and managed about 15 rental properties in the City of Palmdale.[2] Proud American Investments, LLC (Proud American), the Reinosos' management company, managed the properties. The Reinosos also owned another 64 rental properties elsewhere in Southern California. During the 30 years prior to trial, the Reinosos had owned, operated, and managed an additional 35 properties.

In 2001, Edgar pleaded no contest in *People v. Reinoso* (Super. Ct. L.A. County No. 1AT03779) to the charge of permitting a fire hazard at a real estate project, a misdemeanor, and was placed on probation. In 2002, the People filed a 33-count misdemeanor complaint in *People v. Reinoso* (Super. Ct. L.A. County No. 2AT06169) alleging violations of the Palmdale Housing Code at four properties Edgar owned. The counts included pest harborage, inadequate heating facilities, and general dilapidation. Edgar pleaded no contest to eight counts in the complaint, including counts for general dilapidation and pest harborage, and was placed on probation. As part of his plea agreement, Edgar agreed to abate those violations. In 2004, Edgar admitted to violating the terms of his probation by failing to abate certain of the violations.

In May, 2003, the Reinosos acquired a 48-unit apartment complex on West Avenue J-3 in Lancaster (the J-3 Apartments) in their names as "husband and wife, as community property." They testified that they worked together in connection with the management of the property. In late September or early October 2003, the City of Lancaster issued a "Notice of Code Enforcement Corrections" with respect to certain units at the J-3 Apartments. Among the issues raised in the notice were general dilapidation; infestation of insects, vermin, and rodents; inadequate garbage storage; lack of proper water and heat; and dampness of residences.

In January, 2005, the tenants of the J-3 Apartments brought an action against the Reinosos; Proud American; and the J-3 Apartments' former owner, Mark Kaufman, concerning the J-3 Apartments' alleged habitability deficiencies (the Tenant Action). As amended, the Tenant Action alleged causes of action against Edgar and Proud American for breach of written contract (first cause of action) and breach of the implied warranty of habitability (second cause of action); causes of action against Kaufman for

---

[1] As neither party challenges the trial court's findings of fact in its statement of decision, our recitation of facts relies primarily on the statement of decision and the trial exhibits cited in that decision.

[2] For clarity, we will at times refer to the Reinosos by their first names.

breach of the implied warranty of habitability (third cause of action) and negligence (fifth cause of action); and causes of action against Edgar, Linda, and Proud American for negligence (fourth cause of action), nuisance (sixth cause of action), negligent infliction of emotional distress (seventh cause of action), intentional infliction of emotional distress (eighth cause of action), and violation of Business and Professions Code section 17200 (ninth cause of action). The Reinosos have acknowledged that they were sued "as co-owners and co-managers." In their complaint, the tenants alleged habitability deficiencies at the J-3 Apartments, including cockroach infestation, inoperable heating and cooling systems, water leaks, mold, and electrical deficiencies. The tenants also alleged that common areas, including stairways, garbage facilities, and swimming pools were maintained in unsafe and unsanitary condition. According to the tenants, they made repeated requests of defendants to correct the deficiencies, but defendants failed to take proper action. The tenants sought damages against all the defendants "in excess of $10,000,000.00," plus punitive damages, attorney and expert fees, and interest. One consultant of the insurer in the Tenant Action estimated that the compensatory damages could be as much as $30 million. Another opined that the range of potential damages was between $3.5 and $22 million.

The Reinosos tendered the defense of the Tenant Action to their insurer, plaintiff and respondent Axis Surplus Insurance Company (Axis). The Reinosos and Proud American had become insured under two policies providing commercial general liability insurance issued by Axis with respect to the J-3 Apartments. Axis agreed to represent the Reinosos and Proud American in the Tenant Action under a reservation of rights. The action settled for just over $3 million, with Axis contributing $2,162,500.[3] Axis then brought this action against the Reinosos seeking to recover its defense costs and its settlement contribution—together about $2.42 million—in the Tenant Action.

At the trial of the action brought by Axis to recover its defense costs and settlement contribution, Michael King, an attorney, testified that Axis retained him to represent Edgar, Linda, and Proud American in the Tenant Action. King referred to a report he prepared for Axis concerning the Tenant Action. The trial court found that the report provided substantial factual support for the "serious" habitability claims in the Tenant Action and the reasonableness of the ultimate settlement of that action. King testified that he did not believe that Edgar, Linda, and Proud American could prevail in the Tenant Action.

In a report King prepared concerning efforts to settle the Tenant Action, he stated that the Reinosos entered a five-year agreement with Steve Donell of

---

[3] Other insurers contributed $325,000, Kaufman or his insurers contributed $275,000, and the Reinosos contributed $250,000.

Jalmar Properties to manage the J-3 Apartments. Donell's retention, the report stated, would show the Reinosos' good faith efforts to correct any remaining "slum" conditions at the J-3 Apartments. Edgar's onsite property managers told King that before Jalmar Properties began managing the J-3 Apartments, tenants routinely complained about the condition of their apartments. The complaints received little or no response, and the problems escalated. A July 2005 County of Los Angeles inspection report described serious habitability issues with respect to several units at the J-3 Apartments.

King believed that Edgar would not be an effective trial witness before a jury and that a jury would not approve of Edgar's approach to property management given the numerous condition problems with the J-3 Apartments. King's contact with Linda was limited. Linda assisted in locating documents about the J-3 Apartments and their management. King did not believe that Linda had "deep involvement" in managing the J-3 Apartments or "input into decisions in that field." Very little additional time was spent on the representation of Linda. King did not mention Linda in the reports he prepared about the Tenant Action. The foundation for the settlement was the condition of the J-3 Apartments and the "serious concerns" about Edgar as a trial witness.

David Hart, a senior vice-president of claims for Axis, testified that Linda was not a factor in his settlement considerations. Hart testified that he "absolutely did not consider Linda Reinoso's culpability" in reaching the decision to settle the Tenant Action and did not allocate any part of the settlement proceeds toward settling the case against her. Hart's testimony reflected that at this point in Axis's action to recover its costs, Axis minimized Linda's involvement, apparently in the event it was determined that Linda was covered by the insurance. Linda and Edgar argued against Axis's position, suggesting that any liability to Axis should be joint and several—also probably because of the possibility that Linda was covered by the insurance.[4]

Linda testified that she and Edgar had worked together "full-time with the property management and purchasing properties" since 1990. Linda and Edgar married in 1991. Linda testified that she played a somewhat limited role in the management and oversight of the J-3 Apartments and that she paid bills and maintained some records for the J-3 Apartments. The trial court found Linda's testimony about her limited role at the J-3 Apartments to be credible. The trial court found less credible Linda's testimony that she was not aware of the criminal proceedings involving Edgar that arose out of the ownership of rental properties. Edgar testified that Linda played a very limited role in the management of the J-3 Apartments and that her primary

---

[4] Axis and Linda have changed their positions for this appeal.

responsibility was to pay certain bills. The trial court found this testimony not credible, and Linda, based on her testimony, to be more than a ministerial bill payer.

Edgar testified that he had been involved in real estate ownership and the management of rental properties for about 30 years. He claimed to have little insight into the type of maintenance that rental properties needed and little knowledge or understanding of mold, pest control, or needed repairs. He asserted that he hired a site manager for each of his projects and had that person make management decisions without his input. He said that the site managers reported to a general manager in his organization, implying that he played a limited role in maintenance and improvement decisions. The trial court found Edgar to be an unbelievable witness and rejected his effort to persuade it that he was an uninformed and innocent absentee owner. Instead, the trial court found that the evidence established that Edgar was an involved and informed owner who insisted on managing his property in a manner that led to poor living conditions for his tenants.

Donell testified that he worked with Edgar and Linda for three months at the beginning of 2006. He believed that the J-3 Apartments were in a terrible, unsafe, and unsanitary condition at that time. He also believed that Edgar was not a good owner and that Edgar's decisions were guided only by costs and not by proper management principles. Donell considered Edgar's approach to property management to be inappropriate. According to Donell, Edgar wanted "things" done cheaply even if that meant substandard living conditions. Edgar told Donell that he wanted Donell to use the Reinosos' business model. Donell said that Edgar told him that Edgar's "business model was to get new, illegal immigrants from Central America as tenants because they were not aware of their rights and could be threatened with deportation if they complained about conditions."

Donell testified that he spoke with Linda about management issues between 25 and 50 times. Those conversation concerned daily management issues such as maintenance, repairs, and rent rolls. Linda assisted in the creation of a rent roll. Donell found Linda to be informed and engaged. Linda told Donell that the Reinosos had limited funds to spend on repairs. After the Tenant Action settled, Donell left his position with the Reinosos because Edgar would not permit him to perform needed maintenance and make needed repairs.

At trial, Edgar and Linda argued that Axis had failed to allocate "defense and settlement expenses between covered/non-covered claims and as between each insured defendant." There is no evidence that the insurer had made any such allocation. The trial court, in its statement of decision, did not refer explicitly to any such allocation.

After a bench trial, the trial court denied Axis recovery of its defense costs because Axis had failed to carry its burden to show that the claims it defended were not even potentially covered by the insurance policies—a requirement for recovery of defense costs. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 39–40, 50 [65 Cal.Rptr.2d 366, 939 P.2d 766] (*Buss*).) But the trial court awarded Axis $2,143,000 in settlement payments for claims it determined were not covered by the insurance policies at issue—a showing that the claims were not even potentially covered is not necessary for recovery of settlement costs. (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744]; see 2 Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2011) ¶ 7:767.1, p. 7B92 (rev. # 1, 2011).) The trial court, in the judgment, ruled that "Axis shall recover from defendants $2,143,000," plus costs and interest. The trial court did not specify that the award was joint and several, but the parties have assumed on appeal that the award was joint and several.[5] The issue on appeal concerns the extent, if any, of an allocation of the judgment. As we determine that the trial court impliedly allocated to Linda joint and several liability, we assume that the judgment should be construed in that manner. (Cf. *Fowden v. Pacific Coast Steamship Co.* (1906) 149 Cal. 151, 157 [86 P. 178] ["They are all jointly and severally liable, as the injured party may elect. The injured party may sue all or any of them jointly, or each separately, or, having secured a joint judgment against all, enforce such judgment by execution against one only, the only limitation being that he can have but one satisfaction for the injury that he has received."].)[6]

The Reinosos and Proud American appealed from the judgment. The appeals by Edgar and Proud American have been dismissed. In her appeal, Linda contends that the trial court erred when it found that she was not an "innocent" insured entitled to benefits under the insurance policies. Linda also contends that the trial court erred when, for purposes of reimbursement, it failed to apportion the settlement Axis paid among its three insureds—Linda, Edgar, and Proud American—based on the actual settlement costs for each insured and instead, in effect, ordered the insureds to pay the entire sum jointly and severally.

---

[5] Linda states in her reply brief, "the trial court found the defendants jointly and severally liable for the millions of dollars Axis paid to settle the Tenants' lawsuit. . . ."

[6] The court in *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 156 Cal.App.4th 1259 [67 Cal.Rptr.3d 917] (*LA Sound*) (discussed *post* as supporting an apportionment) seems to equate a trial court finding of insurer reimbursement from multiple cross-defendants and a judgment of joint liability against those cross-defendants with joint and several liability. (*Id.* at pp. 1263, 1266, 1271–1272.)

## DISCUSSION

### I. *Substantial Evidence Supports the Trial Court's Finding That Linda Was Not Insured for Her Acts*

Linda contends that the trial court erred in finding that she was not an innocent insured entitled to benefits under the insurance policies because the trial court wrongly applied an objective rather than a subjective standard in determining that she knew of the conditions at the J-3 Apartments, and because substantial evidence does not support the trial court's determination that Linda intended or expected the tenants' injuries. The trial court did not err.

### A. *Standard of Review*

" 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]' " (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765 [123 Cal.Rptr.3d 562], quoting *Estate of Young* (2008) 160 Cal.App.4th 62, 75–76 [72 Cal.Rptr.3d 520].)

### B. *Application of Relevant Principles*

#### 1. *The trial court correctly applied the subjective standard to find that Linda knew of the conditions at the J-3 Apartments*

 Intended, deliberate, and anticipated consequences of acts are not included within the policy coverage for the consequences of accidents. (Ins. Code, § 533 [excludes coverage for willful acts]; *Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 308 [97 Cal.Rptr.3d 298, 211 P.3d 1083]; *State Farm Fire & Casualty Co. v. Superior Court* (2008) 164 Cal.App.4th 317, 325 [78 Cal.Rptr.3d 828].)[7] Linda contends that if she did not expect that the tenants would be injured by the conditions at the J-3 Apartments, then their injuries would be "accidents"

---

[7] The coverage for "Personal and Advertising Injury" is not an issue on appeal.

under the relevant insurance policies and she would be entitled to coverage as an "innocent" insured, notwithstanding Edgar's knowledge of the conditions at the J-3 Apartments. "[W]hether injury or damage is 'expected or intended' under an insurance policy is determined by reference to the insured's subjective mental state." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 720 [3 Cal.Rptr.3d 623, 74 P.3d 726], citing *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 17 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 746 [15 Cal.Rptr.2d 815] ["The plain meaning of 'expected' does not include 'should have known.' Rather, the word comprehends actual belief in the probability of a future event."].) The "test for 'expected' damage is whether the insured knew or believed its conduct was substantially certain or highly likely to result in that kind of damage." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 304–305 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

The trial court rejected Linda's claim that she was unaware of the condition of the J-3 Apartments and the manner in which they were being managed and therefore an innocent insured entitled to coverage under the policies. The trial court determined that the insurance policies excluded from coverage injuries that were " 'expected or intended from the standpoint of the insured.' " Citing *Watts v. Farmers Ins. Exchange* (2002) 98 Cal.App.4th 1246 [120 Cal.Rptr.2d 694], the trial court accepted that even if one insured expected an injury, another insured who did not expect the injury—but who was alleged to be liable for the injury—might be covered under the policy because the "innocent" insured did not expect or intend the injury. The trial court found, however, that Linda "was in a position to learn, and did learn, sufficient information about the management style and apartment conditions to establish that she should be charged with knowledge of the management methods and decisions that were in use."

Linda contends that the "should be charged with knowledge" language "strongly suggests" that the trial court applied an objective rather than a subjective standard—i.e., that Linda should have known, rather than Linda actually knew. The challenged language, however, does not reflect that the trial court used an objective standard. The trial court concluded that based on circumstantial evidence, Linda had sufficient knowledge of the conditions at the J-3 Apartments to expect the injuries alleged in the Tenant Action. The trial court said that Linda "did learn"—i.e., had actual knowledge of—the "management style and apartment conditions." The trial court added that "common sense dictates that [Linda] was not unaware of how these properties were being managed." Moreover, we presume that the trial court applied the correct standard. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193] [" 'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively

shown.' "].) Accordingly, the trial court based its finding that Linda expected the injuries alleged in the Tenant Action, and thus was not an innocent insured, on a subjective standard.

> 2. *There was substantial evidence that Linda knew of the conditions at the J-3 Apartments and how the apartments were being managed and thus expected the tenants to suffer injuries*

There is substantial evidence to support the trial court's rejection of Linda's claim that she was ignorant of the conditions at the J-3 Apartments and the manner in which the apartments were being maintained. Linda and Edgar had worked together full time in purchasing and managing real estate since 1990. Linda owned, with Edgar, the J-3 Apartments. Linda and Edgar owned and managed numerous other properties. Although her role was limited, Linda was involved in managing the J-3 Apartments. By her own testimony, Linda paid the bills for the J-3 Apartments, including the bills for the utilities, pool service, trash collection, and pest control. In the two years prior to the Reinosos' purchase of the J-3 Apartments, Edgar had twice been prosecuted for and pleaded no contest to charges concerning deficiencies in other properties, including charges of general dilapidation and pest harborage. The trial court found Linda's claim that she knew nothing of those prosecutions not credible. Some five months after Linda and Edgar purchased the J-3 Apartments, the City of Lancaster issued a Notice of Code Enforcement Corrections concerning the substandard condition of certain units at the J-3 Apartments. Such evidence is substantial evidence supporting the trial court's finding that Linda knew of the conditions at the J-3 Apartments and how the apartments were being managed and its conclusion that she therefore was not entitled to coverage under the insurance policies.

## II. *Allocation of the Settlement Expenses Among Axis's Insureds*

Linda contends that in connection with Axis's claim for reimbursement of the settlement amount paid, the trial court erred by failing to allocate that amount among its three insureds—Linda, Edgar, and Proud American—based on the amount paid for and attributable to each insured and instead ordered the insureds to pay the entire sum jointly and severally.

An "insurer only has a duty to indemnify the insured for covered claims, and no duty to pay for noncovered claims because the insured did not pay premiums for such coverage. (See *Buss, supra,* 16 Cal.4th at p. 50–51.)" (*Blue Ridge Ins. Co. v. Jacobsen* (2001) 25 Cal.4th 489, 502–503 [106 Cal.Rptr.2d 535, 22 P.3d 313].) Accordingly, an insurer is entitled to reimbursement of reasonable settlement costs paid to settle noncovered claims if

the insurer satisfied the prerequisites for seeking reimbursement: "(1) a timely and express reservation of rights; (2) an express notification to the insureds of the insurer's intent to accept a proposed settlement offer; and (3) an express offer to the insureds that they may assume their own defense when the insurer and insureds disagree whether to accept the proposed settlement." (*Id.* at p. 502.)

Linda does not contend that Axis failed to satisfy the prerequisites for seeking reimbursement of its costs in settling the noncovered claims in the Tenant Action. Instead, relying on *LA Sound, supra*, 156 Cal.App.4th 1259, Linda argues that such settlement costs must be allocated among her and her fellow insureds based on the amounts Axis actually paid for the indemnity of each particular insured. She then points to the testimony of an Axis representative that in making the settlement payment, he did not consider Linda's exposure and did not allocate any of the settlement proceeds to Linda.

In *LA Sound, supra*, 156 Cal.App.4th 1259, Hollywood Sound, Inc., brought an action asserting trademark infringement and other claims against LA Sound USA, Inc. (LA Sound), LSY Trading Development, Inc. (LSY), Ancle Hsu, David Ji, and another person arising out of an aborted joint venture. Hsu and Ji were officers, directors, and shareholders of LA Sound. LA Sound, LSY, Hsu, and Ji tendered the defense of that action to St. Paul Fire & Marine Insurance Company (St. Paul). St. Paul had issued to LA Sound an insurance policy providing $1 million in coverage for liability for personal or advertising injury that extended coverage to LA Sound's officers and directors. (*Id.* at pp. 1263–1264.) St. Paul agreed to defend LA Sound, Hsu, and Ji under a reservation of rights. (*Id.* at p. 1265.)

St. Paul negotiated a $1 million settlement on behalf of LA Sound and on behalf of Hsu and Ji in their capacities as LA Sound officers and directors. (*LA Sound, supra*, 156 Cal.App.4th at p. 1265.) The action against LSY and Hsu and Ji, in their capacities other than as LA Sound officers and directors, continued and was eventually settled for $2.85 million. (*Ibid.*) Thereafter, LA Sound, LSY, Hsu, and Ji brought an insurance coverage action against St. Paul seeking to recover, among other things, defense costs not paid by the insurer and the $2.85 million paid to settle the claims against LSY, Hsu, and Ji. (*Ibid.*) St. Paul filed a cross-complaint alleging that the insurance policy should be rescinded due to misrepresentation. (*Ibid.*) The alleged misrepresentation concerned a false statement—that there was no joint venture—in LA Sound's application for the St. Paul insurance policy. (*Id.* at pp. 1263–1264.) The cross-complaint sought reimbursement of the defense and settlement costs St. Paul had paid. (*Id.* at p. 1265.)

After a trial, the trial court found in favor of St. Paul on its misrepresentation cause of action. (*LA Sound, supra*, 156 Cal.App.4th at p. 1266.) In its

statement of decision, the trial court determined the policy to be rescinded and therefore void from its inception. The trial court ruled that St. Paul was entitled to reimbursement of amounts it incurred in defending and settling Hollywood Sound, Inc.'s action. (*Ibid.*) The trial court entered a judgment against LA Sound, Hsu, and Ji jointly for the defense and settlement costs. (*Ibid.*)

On appeal, the Court of Appeal affirmed the trial court's order of rescission, but reversed the ruling that LA Sound, Hus, and Ji were "jointly" liable for the defense and settlement costs. (*LA Sound, supra,* 156 Cal.App.4th at pp. 1266, 1271.) The Court of Appeal held that although St. Paul was entitled to recover from Hsu and Ji the policy benefits it conferred upon them, the trial court wrongly held Hsu and Ji jointly liable with LA Sound for the entire amount of reimbursement. (*Id.* at p. 1271.) The Court of Appeal reasoned that joint and unallocated liability for Hsu, Ji, and LA Sound would be inconsistent with the principles of allocation of defense costs set out in *Buss, supra,* 16 Cal.4th 35. (*LA Sound, supra,* 156 Cal.App.4th at p. 1272.)

In *Buss, supra,* 16 Cal.4th at pages 47 through 48, the California Supreme Court held that an insurer has a duty to its insured to defend in its entirety a "mixed action"—i.e., an action "in which some of the claims are at least potentially covered and the others are not." In a mixed action, an insurer may not seek reimbursement of defense costs for claims that are potentially covered. (*Id.* at p. 49.) Instead, the insurer may seek reimbursement only of those defense costs that can be allocated solely to claims that are "not even potentially covered." (*Id.* at pp. 50, 53, 57.) When an insurer seeks reimbursement of defense costs in a mixed action, it must prove by a preponderance of the evidence that the defense costs are solely allocable to claims that are "not even potentially covered." (*Id.* at pp. 53, 57.)

The Court of Appeal in *LA Sound, supra,* 156 Cal.App.4th at pages 1272 through 1273, held that in a rescission action, "insurers seeking reimbursement must bear the analogous burden of showing which costs can be allocated to the defense or indemnity of each particular insured." The Court of Appeal reasoned that "[i]t would be inequitable to require a party insured under a rescinded policy to reimburse the insurer the policy benefits it received *and also* all policy benefits that every other insured party received." (*Id.* at p. 1273.)

The Court of Appeal stated, "Insurers that pay defense and indemnity costs are in the best position to monitor the underlying litigation, track expenses, and allocate policy benefits among insureds. The alternatives would be to require every insured under a rescinded policy to reimburse all costs spent defending or indemnifying all other insureds, or to impose upon an insured

defending a reimbursement claim the burden of allocating defense and indemnity costs among itself and all other insureds. The first alternative defeats the equitable purpose of restitution. The second alternative inverts the burden of proof, which *Buss* and Evidence Code section 500 place squarely on insurers asserting claims for reimbursement." (*LA Sound, supra,* 156 Cal.App.4th at p. 1273.)

Axis argues that *LA Sound, supra,* 156 Cal.App.4th 1259 should be limited to rescission cases because rescission is disfavored; the allocation in *Buss, supra,* 16 Cal.4th 35 between covered and noncovered claims in a mixed action does not apply to a rescission action, as rescission renders the insurance policy unenforceable from the outset; and the court in *LA Sound* did not hold that the allocation required between insureds in a rescission action is also required in a *Buss* mixed action.

Linda argues there is no meaningful distinction between the action for rescission in *LA Sound, supra,* 156 Cal.App.4th 1259, and the action for reimbursement of defense and settlement costs in this mixed action case. She notes that both cases concern the reimbursement of policy benefits for claims that were not covered by an insurance policy. If there is a distinction between *LA Sound* and this case, it is in the relationships between the respective defendants and their insurers as they concern the lack of coverage. The *LA Sound* defendants were culpable in the absence of coverage, whereas defendants here were "innocent" vis-à-vis the insurer. We believe that the concept that wrongdoing rescission defendants should receive the benefit of settlement expense allocation, while innocent mixed action defendants should not, makes little sense.

Axis also argues that *LA Sound, supra,* 156 Cal.App.4th 1259 is not relevant to a case such as the instant one, in which joint tortfeasors are jointly and severally liable. *LA Sound* was an action for trademark infringement. (*Id.* at p. 1264.) It may be that the defendants in trademark infringement actions, such as in *LA Sound,* are tortfeasors who are jointly and severally liable for their actions. (*Jonesfilm v. Lion Gate Internat.* (2nd Cir. 2002) 299 F.3d 134, 140, fn. 1; *Chanel, Inc. v. Italian Activewear of Florida* (11th Cir. 1991) 931 F.2d 1472, 1477; *Costello Publishing Co. v. Rotelle* (D.C. Cir. 1981) 216 U.S. App.D.C. 216 [670 F.2d 1035, 1043] [" 'Since joint tortfeasors are jointly and severally liable, the victim of trademark infringement may sue as many or as few of the alleged wrongdoers as he chooses . . . .' "].) But it appears that the court in *LA Sound* did not assume there was joint and several liability. The court said that it was "implausible" that the "two individuals faced the *exact* same liability." (*LA Sound, supra,* 156 Cal.App.4th at p. 1273.) And the court noted that the policies only covered Hsu and Ji for their conduct as directors and officers of LA Sound and "not for any conduct

outside the scope of the corporate duties." (*Id.* at p. 1272.) Nevertheless, that there might be joint and several liability does not mean an apportionment should not be considered. It only suggests, as we conclude in this case, that the apportionment results in joint and several liability to the insurer. And of course, in some cases, the joint and several liability might only be as to some claims or to only certain types of damages.

■ The insurer seeking recovery against the insured for expenditures in settling a case when the claims were not covered should allocate those expenditures among the insureds. As the court in *LA Sound, supra,* 156 Cal.App.4th at page 1273 said, "The right to reimbursement may 'run[] against the person who benefits from "unjust enrichment" ' (*Buss, supra,* 16 Cal.4th at p. 51), but it should do so only to the extent the person *actually* benefits." That benefit, at least here, is the benefit of eliminating potential liability and not the time or costs expended on any particular person or entity being defended. (But see *id.* at pp. 1272–1274.)

As noted, the trial court did not expressly state in its statement of decision that it made an allocation. Rather, it concluded that Linda and Edgar were liable for the $2,143,000 paid by the insurers to settle the Tenant Action. We may infer that the trial court made an implied finding of an allocation, which in this case was Linda's joint and several obligation to reimburse the insurers for the full amount of the settlement payment. Although the trial court issued a statement of decision, Linda's failure to bring to the trial court's attention an omission or ambiguity in that decision permits us to make that inference. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58–62 [58 Cal.Rptr.3d 225].)

There is substantial evidence to support that implied finding. That evidence shows that Linda had a sufficient benefit from the settlement such that not to allocate to her joint and several liability to the insurer of the full amount paid by the insurer to settle the Tenant Action would amount to unjust enrichment.

■ Linda conceded at trial she was jointly and severally liable for any tort committed by Edgar. There is no evidence that she would not be. She was a co-owner of the property in question with Edgar, and the property was held as community property. She participated in the management of the property. Under these circumstances, she should be jointly and severally liable under the causes of action against her in the Tenant Action. (See *Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1084 [111 Cal.Rptr.3d 165] ["Civil Code sections 1431.1 and 1431.2, which limit a defendant's tort liability for noneconomic damages, do not apply to defendants in a joint venture. Defendants in a joint venture are jointly and severally liable for

noneconomic damages, whatever their respective interests in the joint venture."].) Moreover, Linda's community property interest would be liable for obligations in connection with the property. (See Fam. Code, § 910.) Faced with exposure of many millions of dollars, perhaps up to $30 million, and punitive damages, Linda received the full benefit of the settlement.[8] Accordingly, the trial court did not err in its allocation.

## DISPOSITION

The judgment is affirmed. No costs are awarded.

Turner, P. J., and Armstrong, J., concurred.

---

[8] Parenthetically, Linda and Edgar sold the property for a profit of $3.8 million—an amount that exceeded the settlement payment.