Filed 3/29/16  Nesbitt v. Reddish CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOYCE NESBITT,<br><br>    Plaintiff and Respondent,<br><br>CAMERON NESBITT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LUGENIA REDDISH, as Personal Representative, etc., et al.,<br><br>    Defendants and Appellants. | B251741<br><br>(Los Angeles County<br>Super. Ct. No. BC463339) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles F. Palmer, Judge.  Affirmed.

Law Office of Christopher J. Lauria and Christopher J. Lauria for Plaintiffs, Respondent, and Appellant.

Sheila Bennett, in pro. per.; Arminak Law, Tamar G. Arminak, Patrick D. Reider and Suzanna Megrabyan for Defendants and Appellants.

## INTRODUCTION

Joyce and Cameron Nesbitt[1] sued their landlord Sheila Bennett for, among other things, wrongful eviction. After a bench trial, the court found in favor of Joyce, but not Cameron, and awarded damages to Joyce. The court found that Cameron, who was a child during the events underlying this action, had no standing. Both Bennett and Cameron appeal. We affirm the judgment as to both Joyce and Cameron.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Factual background.[2]

In 1992, Mary Horowitz owned a fourplex apartment building on Ogden Drive in Los Angeles. In November 1992, Joyce moved into her mother's, Molly Siegal, apartment at 946½ Ogden Drive in the building. Joyce's son, Cameron, was born in 1994, and he lived with his mother and grandmother in the apartment.

Horowitz, who was friends with Siegal, wanted to give Siegal a 20-year lease. At Horowitz's request, Joyce prepared two lease documents, both dated March 1, 1995, between Horowitz as landlord and Siegal and Joyce as tenants. The lease documents were substantively the same except that the first listed tenant's share of rent as $388 and a Section 8 subsidy as $312 and said "cat ok"; the second listed the tenant's share of rent as $288 and the Section 8 subsidy as $412 and did not refer to a "cat." Both lease agreements also provided in a paragraph titled "Use": "It is agreed that the Premises shall be used only for residence purposes, for one family consisting of 2 adults and (1) one child and no animals, and for no other purposes whatsoever." A third document entitled "Residential Lease (Long Form)" recited that the Section 8 contract would be valid and accepted for the duration of the tenancy and that the housing authority would determine the yearly rent.

---

[1]      To avoid confusion, we refer to plaintiffs by their first names.

[2]      The record of evidence presented to this court is by way of a settled statement. (Cal. Rules of Court, rule 8.137.)

Bennett bought the property from Horowitz's son in 1999 or 2000. At first, the relationship between Bennett and Joyce was polite, with Joyce managing the property when Bennett was out of town. Things changed, however, when Siegal moved out. Joyce believed that Bennett wanted to opt out of Section 8 so she could rent the apartment at market value. Although Joyce hoped eventually to earn enough money not to need Section 8 assistance, she wanted to stay in the apartment because it was subject to rent control even if her Section 8 contract was terminated.

In July 2006, Bennett told Joyce that Joyce didn't have a valid lease and needed to sign a new month to month lease without the Section 8 terms. In November 2006, Bennett complained to the housing authority of Los Angeles that Joyce "never signed a lease with this owner" and asserted that Joyce was not Siegal's daughter. Bennett complained that regulations required Cameron to "have his OWN bedroom . . . . He cannot sleep with 'mama' and cannot use the living room as a bedroom." In December 2006 and in January 2007, Bennett asked the housing authority to write a " 'strongly worded letter' " to Joyce telling her to move out.

Bennett filed her first unlawful detainer action against Joyce in September 2006. Joyce hired an attorney and the complaint was dismissed. But, the night before Thanksgiving 2006, the Nesbitts got a five-day notice to vacate. The notice stated, among other things, "The real issue is that 'Joyce Nesbitt' has no lease under the program at all, and is in a one bedroom with a male child at least 12 years of age who needs to have his own bedroom." The notice frightened 12-year-old Cameron, who was unable to go to school the following Monday because he was afraid they would be evicted. This was followed by another unlawful detainer action, filed in December 2006 or January 2007, which was also dismissed.

Cameron agreed that things changed after his grandmother moved out. Bennett would "glare" at him. Bennett also began to show up at the apartment more often: she would be in the apartment when the Nesbitts got home or they could tell she'd been there, because tape they'd put on the door was broken. Frequently, notices concerning Bennett's intent to make repairs in the apartment were posted on their door, but not all

notices were given 24 hours in advance.[3] They were either posted late at night or the morning the day the work was to be done. Bennett failed to identify the nature of the work and used the notices to enter the apartment and verbally assault Joyce. Sometimes, Joyce could tell that someone had been in the apartment but could not tell what repairs were made. Bennett also entered the apartment without first giving notice. She would stay in the bathroom for hours and would have to be asked to leave when Cameron needed to use the bathroom. Bennett said she could enter the apartment without permission and there was nothing Joyce could do about it.

When Cameron was 12 or 13, Joyce had returned home from being in the hospital. Ill, she vomited in the kitchen sink. Bennett asked to be let into the apartment and then she told them, " 'I took a picture of what was in the sink, and now you're out of here.' " As Cameron got older, he became angry with his mother for continuing to live in the apartment.

In July 2007, Bennett told the police that Joyce and another tenant were selling, using, and making narcotics at the apartment and were using a crawlspace as a "drop" for drugs. At trial, however, Bennett admitted she never saw Joyce get anything from or put anything into the crawlspace. She did not believe that Joyce was selling or making drugs in the apartment but believed she may have been using them.

Bennett filed a third unlawful detainer action in spring 2007, at which point Bennett's harassment (insults, threats, and verbal abuse) increased. Joyce saw Bennett at least once a day, sometimes several times a day.[4]

In spring 2008, Bennett filed an unlawful detainer action based on allegations that Joyce flushed cat food down the toilet, causing flooding in the downstairs

---

[3] The record contains one notice to enter dated in 2006; 10 notices to enter dated in 2008; and eight notices to enter dated in 2009.

Joyce often objected, verbally and in writing, to Bennett's notices to enter. Joyce wrote a letter, dated February 18, 2009, objecting to Bennett's behavior and requesting an itemization of the work to be done.

[4] The record contains another unlawful detainer action filed in November 2007.

apartment. This action was dismissed, and Bennett also lost the small claims action she filed based on the incident.

Also in 2008, Bennett told the Nesbitts they had no right to be in the apartment and that " 'this isn't over.' " After returning home from work one day in August 2008, Joyce found a Chinese bowl and a porcelain statue had been broken. Several papers, including her doctorate dissertation, were missing from her filing cabinet. During this time, Bennett made "spot inspections," appearing at the door and saying she needed to check something. Sometimes, Bennett would take pictures. Such spot inspections were not unusual, and, from March 2009 until the Nesbitts moved out, they occurred two-to-three times a week. Before that time, Bennett conducted them approximately once a week.

Joyce denied Bennett's accusation that the Nesbitts increased Bennett's water bill by intentionally wasting water by leaving water running in the sink and running the washing machine without clothes in it.

In 2009, Bennett became more verbally abusive, again suggesting that Joyce was selling drugs. Bennett made two reports to the police regarding her suspicions during this time. These accusations " 'humiliated' " Cameron. He was scared he'd be taken from his mother. In two letters dated in June 2009, Bennett referred to her accusations that Joyce was selling drugs.[5] Bennett accused Joyce of being a poor mother and refused to negotiate with Joyce because she didn't want to make a " 'deal with the devil.' "

By mid-2009,[6] concerned with the effects these accusations were having on Cameron and on her professional reputation as a psychologist and that child protective services might take Cameron from her, Joyce felt forced to leave. When Joyce asked Bennett what it would take for Bennett to leave her alone, Bennett said that Joyce would

---

[5]    Bennett testified that she didn't believe Joyce used drugs from 2006 to 2009 but she may have been selling them.

[6]    Bennett filed unlawful detainer complaints in March and June 2009.

have to pay market rent, estimated to be $1,500 per month. Joyce, who was no longer in the Section 8 program, was paying $787 per month.

The Nesbitts moved out of the apartment in July 2009, to Beverly Hills, where their rent was $2,000 per month. A month and a half later, they moved to an apartment on Point View in Los Angeles, where they paid $1,500 per month for an apartment that was smaller than their one on Ogden. After just eight months, they moved, in May 2010, to a one bedroom apartment on North Haywood, which was also smaller than the Ogden apartment. After living there for a year, they moved to their current apartment, where their rent is $1,350 per month. The apartment is near a noisy carpentry business, does not have a private front and back porch entrance like Ogden had, and the neighbor's dog barks when the front door is approached. There is no room for a washer and dryer, there is no garage, and there is little street parking—all of which the Ogden property had.

Joyce would have lived in the Ogden apartment for the rest of her life and would never have left a rent controlled apartment.

## II.    Procedural background.

On June 10, 2011, the Nesbitts filed a complaint for housing violations under the Unruh Act; breach of the covenant of quiet enjoyment and wrongful eviction; intentional and negligent infliction of emotional distress; retaliatory eviction; and failure to pay relocation assistance. Bennett answered, asserting, among others, a statute of limitations defense.

After a four-day bench trial, the trial court issued a statement of decision, finding in only Joyce's favor on the wrongful eviction cause of action. Cameron lacked standing on that cause of action because he "was not a party to the underlying lease as he did not sign it and is nowhere identified in the lease as a lessee or tenant. Moreover, he could not be an assignee of the lease insofar as Paragraph 13 of the lease (Exhibits 502 and 503) specifically prohibits the assignment, transfer, sublet, or any other transfer of the lease." The court rejected Bennett's statute of limitations defense and found that the wrongful eviction cause of action was timely brought within the three-year

6

limitations period of Code of Civil Procedure section 338,[7] and under the continuing violations doctrine. The court found against the Nesbitts on the remaining causes of action.

The trial court also made detailed findings of fact and credibility determinations. The court, for example, credited Joyce's testimony regarding the 1995 lease: "As between [Joyce] and [Bennett] on this issue, the court finds [Joyce's] testimony more credible based on their respective demeanors and manners of testifying." The court found "not credible" Bennett's testimony that the lease was forged, based on the witness's "evasiveness." Instead, Bennett was "dissatisfied with the limitations on rent which were imposed by Molly and [Joyce's] participation in the Section 8 program and by the Los Angeles rent control ordinance."

The trial court also found the Nesbitts' testimony about the harassment they endured credible; for example, the court believed their testimony about spot inspections and about the incident involving vomit in the sink. The court found untrue Bennett's contention that the Nesbitts wasted water.

Although Bennett testified that the repeated notices to enter were necessitated by repair work she did to the Nesbitts' apartment and to work she was doing to the building's exterior, the court found that a video taken by Joyce upon moving out "significantly contradicted and rendered not credible the claims of [Bennett] that her repeated notices to enter and her above-referenced inspections without notice were for the purpose of doing significant repair work to the apartment. . . . [T]he video corroborated [Joyce's] testimony that little work was actually done by [Bennett] on 946½ and substantially discredited [Bennett's] testimony that substantial work had been done." The court noted that in the "single year following February 18, 2008, [Joyce] received 18 such notices to enter for a total of 53 days."

Also, Bennett's "evidence" that Joyce used drugs could not "credibly serve as the basis for an honest belief that someone was selling drugs. The court finds that the

---

[7] All further undesignated statutory references are to the Code of Civil Procedure.

7

accusations [Joyce] was selling drugs were motivated by a desire on the part of [Bennett] to cause [the Nesbitts] to leave . . . so that [Bennett] could obtain the market rate for rent . . . . "

Judgment in the amount of $138,340 was entered on July 30, 2013. Bennett and Cameron both appeal.

## CONTENTIONS

Bennett contends I. that the judgment on the wrongful eviction cause of action was not supported by sufficient evidence; II. the wrongful eviction cause of action was barred by the statute of limitations; and III. Joyce had unclean hands.

Cameron contends IV. he had standing to sue on the wrongful eviction cause of action.

## DISCUSSION

**I.     Sufficient evidence supports the wrongful eviction judgment in Joyce's favor.**

Bennett contends there is insufficient evidence to support the judgment in Joyce's favor on the wrongful eviction cause of action. We disagree.

Bennett's contention is based on a misunderstanding of the applicable standard of review. When an appellate court reviews a statement of decision issued after a bench trial, the court's findings of fact are reviewed under the substantial evidence standard, and the trial court's resolution of a question of law is subject to independent review. (*Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 935.) We uphold the trial court's findings of fact if there is substantial evidence to support the findings, even if other evidence would support a contrary finding. (*Ibid.*; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874; *Romero v. Eustace* (1950) 101 Cal.App.2d 253, 254 ["When there is substantial evidence, although conflicting, that sustains the judgment an appellate court will not substitute its evaluation of the evidence or its opinion as to the credibility of the witnesses for that of the trial court"].) In evaluating the support for a finding, we view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor.

8

(*Brewer,* at p. 935.)  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  (*Axis Surplus Ins. Co. v. Reinoso* (2012) 208 Cal.App.4th 181, 189; *James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021.)  Appellant bears the burden of demonstrating that the record does not contain sufficient evidence to sustain a challenged finding of fact.  (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)

" 'A constructive eviction occurs when the acts or omissions . . . of a landlord, or any disturbance or interference with the tenant's possession by the landlord, renders the premises, or a substantial portion thereof, unfit for the purposes for which they were leased, or has the effect of depriving the tenant for a substantial period of time of the beneficial enjoyment or use of the premises.' [Citations.]" (*Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 925-926.)  Any interference by the landlord that deprives the tenant of the beneficial enjoyment of the premises or renders the premises unfit for the purposes for which they are let, amounts to a constructive eviction if the tenant so elects and vacates within a reasonable time.  (*Pierce v. Nash* (1954) 126 Cal.App.2d 606, 612-613; *Tooke v. Allen* (1948) 85 Cal.App.2d 230, 236; *Kulawitz v. Pacific etc. Paper Co.* (1944) 25 Cal.2d 664, 670.)

Bennett does not address the substantial evidence supporting the judgment; for example, her accusations that Joyce was dealing and/or selling drugs, her numerous entries into the apartment with and without notice, the "spot inspections," her failure to make repairs in the apartment, and her verbal abuse.  Instead, Bennett suggests that the Nesbitts "voluntarily abandoned" their home because Joyce was no longer eligible for Section 8 assistance.  The trial court, however, expressly found the contrary true:  Joyce "has met her burden of proving by a preponderance that [Bennett's] acts and the resulting disturbance and interference with the possession of 946½ by [Joyce] had the effect of depriving [Joyce] for a substantial period of time of the beneficial enjoyment of 946½ ."  We have detailed the more than sufficient evidence supporting that finding, including Joyce's testimony that but for Bennett's actions, Joyce would not have left her rent controlled apartment.

Bennett next discounts the harassment she perpetrated against the Nesbitts as "supported only by" Joyce's and Cameron's testimony. The testimony, however, of a single witness is enough to support a judgment. (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 171.) The court, which observed the witnesses over the course of a four-day trial, was well within its discretion to believe the Nesbitts and to disbelieve Bennett. (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204-1205.)

Although Bennett argues that she made repairs without interfering with the Nesbitts' quiet enjoyment, the trial court disbelieved Bennett's testimony on this issue as well. The court found that a video Joyce took of her apartment before vacating it "corroborated [Joyce's] testimony that little work was actually done by [Bennett] on 946½ and substantially discredited [Bennett's] testimony that substantial work had been done." Joyce and Cameron also testified about the numerous times Bennett entered their apartment, with and without notice, yet made no repairs. The Nesbitts testified about the effect Bennett had on them. Cameron would lock himself into his bedroom. He felt humiliated by Bennett and would not have his friends come over. Joyce was afraid her coworkers, who came by the apartment to drop off work, would hear Bennett's accusations and that this would affect Joyce's job. Worse, she was afraid that Bennett's drug accusations could lead to Cameron being taken from her.

Finally, Bennett argues that her unlawful detainer actions were a good faith resort to legal process that cannot amount to constructive eviction. (*Asell v. Rodrigues* (1973) 32 Cal.App.3d 817, 824.) Although the trial court recounted the multiple unlawful detainer actions Bennett filed against the Nesbitts, it did not state it was basing its judgment on those filings.

**II. The wrongful eviction cause of action was not barred by the statute of limitations.**

The trial court found that the wrongful eviction cause of action was timely under the three-year limitations period in section 338.[8] Bennett, however, contends that the cause of action was barred by the one-year limitations period in section 340, subdivision (a).[9] We disagree.

Bennett's argument that the one-year limitations period applies is based solely on the complaint's prayer for, among other damages, "[t]reble damages." From that sole reference, Bennett concludes that the wrongful eviction cause of action "appears to be based upon the City of Los Angeles' Rent Stabilization Ordinance." The wrongful eviction cause of action, however, does not refer to the ordinance. This contrasts with the complaints in *Sylve v. Riley* (1993) 15 Cal.App.4th 23 and *Menefee v. Ostawari* (1991) 228 Cal.App.3d 239, where all causes of action were based on violations of San Francisco ordinances providing for treble damages; hence, those actions were ones upon a statute for penalty to which the one-year limitations period in section 340 applied.

Here, although Bennett suggests that the second cause of action was brought under Los Angeles Municipal Code section 151.11, which concerns a tenant's refusal to pay rent in excess of the maximum rent, there is no allegation concerning that section in the complaint.[10] Instead, the Nesbitts alleged that when they refused to vacate their apartment, Bennett began a "systematic, calculated effort of harassment" to force them to leave. Defendant's activities "rendered the rental premises unfit for the purposes for

---

[8] Section 338 provides: "Within three years: [¶] . . . [¶] (b) An action for trespass upon or injury to real property." (§ 338, subd. (b).)

[9] Section 340, subdivision (a), provides for a one-year limitations period for an "action upon a statute for a penalty or forfeiture."

[10] The Nesbitts' complaint did ask for treble damages in the first cause of action for housing violations under the Unruh Act. Also, the sixth cause of action was brought under Los Angeles Municipal Code section 159.09G. The Nesbitts did not prevail on those causes of action.

11

which they are leased and deprived plaintiffs of the beneficial enjoyment of the premises" and "constituted such a disturbance of plaintiff's use and enjoyment of the premises that plaintiff was forced to quit and vacate the premises." Nothing in the complaint suggested that the second cause of action was for anything but common law wrongful eviction. (See generally *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1039 [elements of common law wrongful eviction are plaintiff's possession of premises and defendant's forcible entry]; *Glaser v. Meyers* (1982) 137 Cal.App.3d 770, 773-774.)

Bennett alternatively argues that, in any event, the wrongful eviction cause of action is barred under the three-year limitations period in section 338, because the action began to accrue when she first interfered with the Nesbitts' possession, in September 2006; hence, the action had to be filed by or about September 2009. The complaint, however, was filed on June 10, 2011.

The trial court rejected this argument under the continuing violations doctrine. That "doctrine aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192 (*Aryeh*).) The doctrine "serves a number of equitable purposes. Some injuries are the product of a series of small harms, any one of which may not be actionable on its own. [Citation.] Those injured in such a fashion should not be handicapped by the inability to identify with certainty when harm has occurred or has risen to a level sufficient to warrant action. [Citations.] Moreover, from a court-efficiency perspective, it is unwise to impose a limitations regime that would require parties to run to court in response to every slight, without first attempting to resolve matters through extrajudicial means, out of fear that delay would result in a time-barred action. [Citations.] Allegations of a pattern of reasonably frequent and similar acts may, in a given case, justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period." (*Id.* at pp. 1197-1198.)

12

The party asserting a statute of limitations has the initial burden of proving the claims are barred. (*Aryeh, supra,* 55 Cal.4th at p. 1197.) Thereafter, the burden shifts to the opposing party to demonstrate his or her claims survive based on one or more nonstatutory exceptions to the limitations period, such as the continuing violations doctrine. (*Ibid.*) Resolution of the defense of statute of limitations is normally a question of fact, but when uncontradicted facts are susceptible of only one legitimate inference, the court may determine the matter as a question of law. (See *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)

The trial court found that Joyce met her burden of showing that her action was timely: "insofar as the elements of the cause of action . . . necessarily entail the accumulation of acts or omissions by the landlord to create the conditions which have the effect over time of rendering the premises unfit for the purposes for which they were leased or having the effect of depriving the tenant 'for a substantial period of time' of the beneficial enjoyment or use of the premises. Moreover, it is often the case, as it is here, that an individual act of the landlord may be insufficient to render the premises unfit or to deprive the tenant of quiet enjoyment of the premises, but that an accumulation of acts and omissions over time does rise to the required level of interference. Thus, the court finds that application of the continuing violations doctrine . . . is warranted insofar as [Joyce] has shown 'a pattern of frequent and similar acts which justify treating the acts as an indivisible course of conduct actionable in its entirety, notwithstanding that the conduct occurred partially outside and partially inside the limitations period."

Substantial evidence supports the trial court's application of the continuing violations doctrine. Joyce and Cameron both testified that Bennett's behavior toward them changed in about 2006. From 2006 until they moved out of 946½ Ogden in July 2009, they experienced a variety of injuries. The night before Thanksgiving 2006, for example, the Nesbitts received a five-day notice to quit, which particularly frightened Cameron because it referred to the fact a male child was living in a one-bedroom apartment. Also in 2006, Bennett tried to get the Nesbitts' Section 8 assistance revoked.

13

In 2007, she filed a police report accusing Joyce of selling and/or using drugs. Bennett's harassment escalated in 2008, with Bennett demanding, sometimes several times a day, access to the apartment. Bennett entered the apartment when the Nesbitts weren't home. From March 2009 until the Nesbitts moved out, Bennett's "spot inspections" were happening two-to-three times a week. During her inspections, Bennett verbally harassed Joyce. In mid-2009, Bennett repeated her accusations that Joyce was using or selling drugs. Believing that this threatened her professional career and Cameron, Joyce now felt she had no choice but to leave 946½ Ogden. This evidence establishes that Bennett engaged in a pattern of reasonably frequent and similar harassing acts over the course of three years, beginning in 2006 and continuing until the Nesbitts moved out in July 2009.

Bennett, however, cites *Menefee v. Ostawari* to support her assertion that the continuing violations doctrine does not apply to a wrongful eviction action. (*Menefee v. Ostawari, supra,* 228 Cal.App.3d at p. 245.) *Menefee* is factually inapposite, being based on the accrual of a cause of action under a specific San Francisco ordinance. Moreover, *Menefee* contained no blanket prohibition on applying the doctrine to wrongful eviction actions.

### III. Unclean hands.

Bennett also contends that the doctrine of unclean hands bars Joyce's wrongful eviction cause of action. "Unclean hands . . . requires inequitable conduct by the plaintiff in connection with the matter in controversy and provides a complete defense to the plaintiff's action." (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 446.) Bennett claims that Joyce had "unclean hands" because Joyce created fraudulent lease agreements, created at least one fraudulent notice to enter, flushed cat food down the toilet, and deliberately ran water to increase Bennett's costs.

It is not clear on this record that Bennett argued this defense at trial. In any event, the trial court found that Joyce did *not* engage in this conduct. It found, for example, Bennett's "testimony about this 'fraudulent' lease not credible based on [Bennett's] evasiveness and her demeanor and manner while testifying. In any event,

14

no convincing evidence of fraud with respect to any lease was submitted at trial . . . . " The court also found not true Bennett's contentions about Joyce wasting water. The court thus rejected any unclean hands defense, and where, as here, substantial evidence supports the court's findings, we will not reweigh the evidence and make our own credibility determinations. (*Axis Surplus Ins. Co. v. Reinoso, supra,* 208 Cal.App.4th at p. 189.)

## IV. Cameron's standing to sue.

Cameron has appealed the trial court's finding that he lacked standing. In making that finding, the court relied on the lease. The court found that Cameron "was not a party to the underlying lease as he did not sign it and is nowhere identified in the lease as a lessee or tenant." It is undisputed that Cameron did not sign the lease. Cameron asserts, however, that he had standing under the Los Angeles Rent Control Stabilization Ordinance.[11] (L.A. Mun. Code, § 151.02 [a "tenant" is a "person entitled to use or occupancy of a rental unit"]; see *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28 [where lease allowed named tenant "and 2 (two) roommates" to occupy premises, landlord could not evict roommate, under provisions of a Berkeley ordinance].) On this record, Cameron never raised that issue in the trial court, and the court never considered it. It is therefore forfeited. (See generally *Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1398-1399; *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 1002.)

---

[11]     Based on Cameron's assertion that his standing is based on the ordinance, we asked the parties to submit supplemental briefing.

## DISPOSITION

The judgment is affirmed.  The request for judicial notice, filed April 1, 2015, is granted.  All parties to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

WE CONCUR:

EDMON, P. J.

JONES, J.*

---

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.