Filed 6/11/20; Certified for Partial Publication 7/8/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RONALD F. COLEY, | C084328 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2014-00171851-CU-MC-GDS) |
| v. | |
| ESKATON et al., | |
| Defendants and Appellants. | |

Eskaton, Eskaton Village-Grass Valley (Eskaton Village), and Eskaton Properties Inc. (collectively, the Eskaton entities) are related corporations that develop and support common interest developments for older adults in Northern California. Ronald F. Coley owns a home in one of their developments, Eskaton Village Grass Valley (the Village). He brought this suit against the Village's homeowners association, two of the directors on the association's board, and the directors' employers (the Eskaton entities), alleging these directors ran the association for the benefit of the Eskaton entities rather than the association and its members.

1

The trial court agreed with Coley in part, finding these directors breached their fiduciary duty to the homeowners association and its members in several respects. In particular, the court found one director improperly shared with the Eskaton entities the association's privileged communications with its counsel, and both directors, in violation of the association's governing documents, approved certain assessments that benefited the Eskaton entities and harmed many of the association's members. Based on this conduct, the court found the directors' employers, the Eskaton entities, were liable for any damages Coley suffered as a result, though it declined to find the directors liable in their personal capacities. It awarded Coley damages of $2,328.51 and attorney fees of $654,242.53.

Both parties appealed. The Eskaton entities and the two director defendants (collectively, the defendants) contend the court should have afforded the directors more deference under the business judgment rule—a rule under which courts tend to defer to the decisions of corporate directors. They also claim the court misread the association's governing documents, miscalculated appropriate damages, and misapplied vicarious-liability principles in finding the Eskaton entities liable for their employees' conduct even though their employees were not liable themselves. Finally, they assert the court awarded an excessive amount of attorney fees. Coley, in his cross-appeal, raises several additional issues. He contends the court should have found the two directors personally liable for their conduct, and alleges the court wrongly rejected several of his claims against the defendants.

We agree in part with both of the parties. We find, as the defendants contend, that the court miscalculated the damages on certain claims and should, after reducing the damages award on remand, reconsider the awarded attorney fees in light of this reduction. We also agree, as Coley asserts, that the court should have found the two directors personally liable for their actions. In all other respects, we affirm the judgment.

2

BACKGROUND

I.    *The Village and the Association*

The Eskaton entities, among other things, develop and support common interest developments for older adults in Northern California. One of those developments is the Village. The Village consists of 130 homes known as the "Patio" homes and 137 rented residences housed in a building known as the "Lodge." It also consists of several common areas accessible to both Patio and Lodge residents, including walking paths and a maintenance building. Eskaton Village, an Eskaton subsidiary, owns the Lodge and its 137 residences, and various individual homeowners, including Coley, own the 130 Patio homes. Eskaton Properties, another Eskaton subsidiary, is responsible for the Village's day-to-day management.

Eskaton Village and the Patio homeowners are members of the Eskaton Village, Grass Valley Homeowners Association (the Association), a nonprofit mutual benefit corporation. A five-member board of directors runs the Association subject to the requirements of the Association's governing document, the "Declaration of Covenants, Conditions and Restrictions for Eskaton Village-Grass Valley Homeowners Association" (or the CC&Rs).

II.   *The Association's Governance Structure*

Since the Association's inception, Eskaton Village has controlled three out of the five seats on the Association's board. Under the CC&Rs, the owners of the 267 housing units (the 137 Lodge residences and 130 Patio homes) are entitled to one vote per housing unit owned. Because Eskaton Village owns a majority of these units (137 of 267), it holds a perpetual voting majority.

Exercising its majority voting power, Eskaton Village has consistently elected three employees of the Eskaton entities to sit on the Association's board. And, at least in recent years, it has appointed directors who are financially incentivized to run the Association for the benefit of Eskaton Village. Two of those employees are defendants

3

here, Todd Murch and Elizabeth L. Donovan.  Murch is the chief executive officer and president of all the Eskaton entities.  Donovan is the chief operating officer of all the Eskaton entities.  Both are paid by Eskaton Properties and receive bonuses and incentive compensation in part based on Eskaton Properties' performance.  Eskaton Properties' performance, in turn, is based in part on Eskaton Village's performance.  The higher Eskaton Village's operating losses, for example, the lower Eskaton Properties' profits given the latter's subsidizing of Eskaton Village in years of operating losses—which, in fiscal year 2015 alone, amounted in a subsidy of hundreds of thousands of dollars.  Given Murch's and Donovan's pay structure, the lower this subsidy (i.e., the better Eskaton Village performs) the higher their potential compensation.

III.    *The Association's Assessments for Security Services*

Under the CC&Rs, the Association is authorized to levy various assessments against Eskaton Village and the Patio owners.  Using this authority, the Association has assessed both for, among other things, "Security/Emergency Response" services since its creation in the early 2000s.

For its initial 10 years, the Association allocated the cost of providing these security and emergency response services equally between Eskaton Village and the Patio owners, with each covering 50 percent of the total cost.  But in late 2012, the Association's board, in a three-to-two vote, approved a new budget that increased the Patio owners' relative responsibility for the cost of these services.  Under the new budget, the Patio owners would cover 83.3 percent of the total costs of security services and Eskaton Village would cover the remaining 16.7 percent.  The Eskaton-affiliated directors, including Murch and Donovan, all voted in favor of the new budget.  The two other directors, including Coley, voted against.

IV.    *Coley's Suit and the Trial Court's Judgment*

In November of 2014, Coley and another Patio homeowner, Karen B. Lorini, filed a class action against the Eskaton entities, Murch, Donovan, and, as a nominal defendant,

4

the Association.[1]  In their complaint, the two named plaintiffs alleged that Murch and Donovan, acting pursuant to the direction of the Eskaton entities, were managing the Association for the benefit of the Eskaton entities and to the detriment of the Patio owners.  In particular, the plaintiffs contended that Murch and Donovan unlawfully voted to require the Patio homeowners to cover 83 percent of the cost associated with security services, allowed Eskaton Village to use the Association's maintenance building rent free, and engaged in various other acts of misconduct to benefit the Eskaton entities.  In doing so, the plaintiffs asserted, the defendants breached their fiduciary obligations to the Association and its members and committed elder abuse against Patio owners like Coley who were aged 65 or older.

Coley and Lorini later amended their complaint to add additional causes of action in light of the defendants' postcomplaint conduct.  The first addition concerned the Association's assessment for legal fees.  To cover the cost of litigation in this case, the Association initially relied on assessments imposed on both the Patio and Lodge owners.  But beginning in late 2015, it began imposing certain fees on the Patio owners alone.  Coley and Lorini contended the director defendants violated the Association's CC&Rs in approving this change.  The second addition concerned Murch's disclosure of certain records.  The Association's attorneys advised the Association on certain matters relating to this litigation.  At some point, Murch shared this information with his personal counsel and the Eskaton entities' counsel.  Based on this conduct, Coley and Lorini alleged Murch breached his fiduciary duty to the Association by disclosing the Association's privileged communications.

Before trial, Coley and Lorini moved to certify their action as a class action on behalf of themselves and similarly situated Patio homeowners.  But after Coley's

---

[1]  Coley and Lorini also originally named Mark T. Cullen and Trevor Hammond as additional defendants, but neither were listed in the plaintiffs' final amended complaint.

5

individual claims were severed from the proposed class to expedite the resolution of his claims, the parties agreed to stay the hearing on the motion for class certification until after the resolution of Coley's claims.

The trial on Coley's claims began in December of 2015, and in early 2017, the trial court issued its judgment. Before addressing Coley's specific claims, the court first noted a "principle issue in this case guiding the Court's determination of Plaintiff's claims against Defendants is whether a conflict of interest was created when Eskaton retained control of the [Association] Board of Directors by filling three positions with its own employees." The court concluded it was. Although Murch and Donovan, as directors of the Association, were charged with serving the best interest of the Association and all its members, the court found both were financially incentivized to operate the Association for the benefit of one member in particular—Eskaton Village. The court explained that both directors were paid in part based on Eskaton Properties' performance, and that Eskaton Properties' performance in turn was based in part on Eskaton Village's performance. Thus, the court reasoned, "the conclusion is inescapable that the financial success of [Eskaton Village] plays a role in determining [the directors'] compensation and advancement, even if is not the only factor." The court found this pay structure left the directors in an "irreconcilable conflict of interest."

Turning to Coley's specific claims, the trial court agreed in part with six of his 12 causes of action, several of which overlapped. It found Murch and Donovan breached their fiduciary duties and violated the Association's CC&Rs when they voted to raise the Patio owners' share of the security and emergency response costs from 50 percent to 83.3 percent. It found they further breached their fiduciary duties and violated the Association's CC&Rs when they voted to charge certain legal expenses to the Patio owners alone. And it found Murch also breached his fiduciary duty when he disclosed the Association's privileged communications with its counsel to further his own "interest rather than the interest of the [Association]." Because of this conduct, the court found all

6

the defendants—including the corporate defendants—were liable to pay damages to Coley that resulted from the various breaches of fiduciary duty. The court calculated these damages to be $2,328.51.

The court, however, clarified in a prejudgment order that only the corporate defendants were in fact liable to pay this amount. Following the court's proposed statement of decision, Coley asked the court to clarify that Murch and Donovan were liable in their personal capacities. But the court declined to find the two directors liable, reasoning that Coley had failed to show they acted in self-interest, benefited from their breach of fiduciary duty, or mismanaged the Association. The court went on to note, however, that Eskaton Properties and Eskaton Village were "vicariously liable" for damages caused by the directors within the scope of their employment.[2]

Following the court's judgment, Coley moved to obtain attorney fees under Civil Code section 5975, which allows the prevailing party in any action to enforce the CC&Rs of a common interest development to obtain attorney fees and costs. Coley contended the court should find all his attorneys' time compensable, apply a positive multiplier to enhance the fee award, and award total fees in the amount of $1,140,445.03. The defendants, in opposition, contended the court should instead apply a negative multiplier and award fees only for the time spent on claims that allowed attorney fees. The court struck a middle path. Because it believed the considerations in favor of either a positive or negative multiplier canceled out, it rejected the parties' competing demands for a multiplier and instead declined to apply any multiplier. And because it found "the factual issues between fee-eligible and non-fee eligible claims were inextricably intertwined," it also rejected the defendants' request that Coley be awarded fees only for the time spent

---

[2] As the defendants note, the court's reference to Eskaton Properties and Eskaton Village alone, and not also Eskaton, was an apparent oversight.

7

on fee-recoverable claims. The court awarded Coley attorney fees in the amount of $648,058.25 plus accrued interest of $6,184.28, for a total of $654,242.53.

Both parties timely appealed the court's judgment.

DISCUSSION

I.     *The Defendants' Appeal*

   A.     *The Corporate Defendants' Liability*

The defendants first contend the trial court's judgment misapplied the doctrine of respondeat superior—a doctrine providing that "an employer may be held vicariously liable for torts committed by an employee within the scope of employment." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208.) The employer's liability in that case is vicarious, rather than direct, because it "is wholly derived from the liability of the employee." (*Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1423.) The defendants maintain the court here violated these principles in finding the corporate entities vicariously liable for the directors' conduct, even though it found the directors were not themselves liable.

We question, however, whether the court in fact found the Eskaton entities liable based on principles of vicarious, rather than direct, liability. True, the court in a prejudgment order noted in one sentence that Eskaton Village and Eskaton Properties were "vicariously liable for damages caused by" the two directors, even though it believed these directors were not personally liable. But to understand the court's reasoning, we must look to the court's judgment. And the court there neither referenced the Eskaton entities' vicarious liability nor applied vicarious-liability principles. It instead relied on decisions—principally *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783—that found companies *directly* liable for their employees' conduct. The court in *Raven's Cove* found a developer's employees' mismanagement of a homeowners association was ground for finding the developer breached *its own* fiduciary duty to the association. (See *id.* at p. 800 ["the failure of the

8

initial Association directors to exercise supervision which permits mismanagement or nonmanagement is an independent ground for the breach of fiduciary duty by the Developer"].)  And the court here followed that logic in finding the Eskaton entities liable for damages resulting from their employees' mismanagement of the Association.

Even assuming the court relied on vicarious-liability principles in finding the Eskaton entities liable, the defendant's argument would still fail in light of our conclusion in Part II.A., *post*, that the trial court should have found both Murch and Donovan personally liable, thus providing the necessary predicate for vicarious liability.

B.      *Application of the Business Judgment Rule*

The defendants' next claim the court misapplied the business judgment rule.  The business judgment rule is a policy of deference to a corporate board's decisionmaking. (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 257 (*Lamden*).)  But the trial court here found the rule inapplicable because the Eskaton entities' employees who sat on the Association's board had an "irreconcilable conflict of interest" that "preclude[d] the business judgment rule as a defense to liability in this case."  According to the defendants, rather than finding this conflict precluded the business judgment rule altogether, the court instead should have afforded the defendants an opportunity to reclaim the benefit of the rule by showing they acted in good faith after reasonably investigating material facts.  We view the law differently.

1.  *Background law*

California recognizes two types of business judgment rules:  one based on statute and another on the common law.  (*Lamden, supra*, 21 Cal.4th at p. 259 & fn. 6.) Corporations Code section 7231 supplies the relevant statutory rule for nonprofit mutual benefit corporations like the Association.  Under that statute, a director is not liable for "failure to discharge the person's obligations as a director" if the director acted "in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like

9

position would use under similar circumstances." (Corp. Code, § 7231, subds. (a), (c).) The common law business judgment rule is similar but broader in scope. It is similar in that it immunizes directors for their corporate decisions that are made in "good faith . . . to further the purposes of the [corporation], are consistent with the [corporation's] governing documents, and comply with public policy." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 374; see *Lamden, supra*, 21 Cal.4th at p. 257.) And it is broader in that it also " 'insulates from court intervention those management decisions' " that meet the rule's requirements. (*Lamden, supra*, 21 Cal.4th at p. 257.)

A director, however, cannot obtain the benefit of the business judgment rule when acting under a material conflict of interest. (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 430 (*Everest Investors*); *Gaillard v. Natomas Co.* (1989) 208 Cal.App.3d 1250, 1263.) Deference under the business judgment rule is premised on the notion that corporate directors are best able to judge whether a particular transaction will further the company's best interests. (*Gaillard, supra*, 208 Cal.App.3d at p. 1263.) But that premise is undermined when directors approve corporate transactions in which they have a material personal interest unrelated to the business's own interest. And it is particularly undermined when a majority of these directors approve transactions while having a material conflict of interest. Under those circumstances, the directors carrying this conflict of interest are precluded from seeking the benefit of the business judgment rule. (See *Everest Investors, supra*, 114 Cal.App.4th at p. 430; *Gaillard, supra*, 208 Cal.App.3d at p. 1263.)

But although the business judgment rule is inapplicable under these circumstances, that is not to say that corporate decisions affected by these types of conflicts are improper as a matter of law. As with the business judgment rule generally, statutory and common law requirements are again relevant in this context. Corporations Code section 7233 supplies the relevant statutory rule. It provides, among other things, that an interested director who casts a deciding vote on a transaction must show the "transaction was just

10

and reasonable as to the corporation at the time it was authorized, approved or ratified." (Corp. Code, § 7233, subd. (a)(3).) Section 7233, however, only applies to transactions "between a corporation and one or more of its directors, or between a corporation and any domestic or foreign corporation, firm or association in which one or more of its directors has a material financial interest." (Corp. Code, § 7233, subd. (a).) The common law rule, as before, is similar but broader in scope. It is similar in that it requires interested directors to "prove that the arrangement was fair and reasonable"—a rigorous standard that requires them " 'not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.' " (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 31-32 (*Tenzer*).) And it is broader in that, unlike Corporations Code section 7233, it is not concerned only with transactions between a corporation and either its directors or a business in which its directors have a material financial interest. (See Corp. Code, § 7233, subd. (a).) Rather, recognizing the potential for self-dealing may also exist outside this particular context, courts have found directors must also satisfy the common law requirements when they approve other transactions in which they have a material financial interest distinct from the corporation's own interest. (See *Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 127-128 (*Heckmann*) [directors who approved corporate action intended to stave off a company takeover and protect their board positions were required to show "the transaction was entered in good faith" and was "inherent[ly] fair[] from the viewpoint of the corporation and those interested therein"]; see also *Remillard Brick Co. v. Remillard-Dandini Co.* (1952) 109 Cal.App.2d 405, 416-421 [common law requirements of "good faith" and "inherent fairness" exist independent of statutory " 'just and reasonable' " requirements].)

### 2. *The trial court's application of the business judgment rule*

Turning to the trial court's decision here, we find the court appropriately summarized the relevant principles governing the business judgment rule. It correctly

explained that directors acting under a conflict of interest cannot obtain the benefit of the business judgment rule. (See *Everest Investors, supra*, 114 Cal.App.4th at p. 430.) And it rightly added that although "a conflict does not necessarily establish actionable impropriety," it shifts the burden to the director to show the transaction was " 'just and reasonable.' "[3] (See *Tenzer, supra*, 39 Cal.3d at pp. 31-32.)

The defendants make no effort to satisfy this "just and reasonable" standard, but instead assert the trial court should have shifted the burden to the Eskaton directors to show they approved the disputed transactions in "good faith" after a "reasonable inquiry."

In support of this alternative standard, the defendants rely on *Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352 and *Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694. *Katz* concerned a corporate board's defensive actions in response to an attempted corporate takeover—actions that were reviewed under Delaware law. (*Katz, supra*, 22 Cal.App.4th at pp. 1367-1368.) Applying Delaware law, the *Katz* court found that because the board directors might have acted to protect their own interests in adopting these defensive measures, the board was not entitled to deference under the business judgment rule unless it first passed the "enhanced" scrutiny test—that is, unless the board showed (1) it had reasonable grounds for believing that " 'a danger to corporate policy and effectiveness existed because of another person's stock ownership' "—which

---

[3] The trial court derived the "just and reasonable" standard from Corporations Code section 7233. On the facts here, however, we believe it better to find these principles derive from the common law rather than section 7233. As discussed in Part I.B.1. *ante*, section 7233 only applies to transactions between a corporation and its directors or a business in which its directors have a material financial interest. (Corp. Code, § 7233, subd. (a).) And the disputed transactions here do not fit within one of these categories. But even so, we still agree with the court's finding that the director had the burden to show the transaction was just (or fair) and reasonable. (See *Tenzer, supra*, 39 Cal.3d at pp. 31-32 [discussing the common law "fair and reasonable" requirements].)

could be established by " ' "showing good faith and reasonable investigation" ' "—and (2) its action was " 'reasonable in relation to the threat posed.' " (*Id.* at p. 1367.) The *Lee* court, in turn, relied on *Katz* in discussing California's general background rules on conflicts of interest—even though the *Katz* decision concerned Delaware, not California, law. (*Lee, supra*, 50 Cal.App.4th at p. 715.) Never mentioning its principles derived from Delaware law, the *Lee* court suggested that a director is not entitled to the benefit of the business judgment rule in the event of a conflict of interest, unless the director first shows "good faith and reasonable investigation." (*Ibid.*) But that suggestion was ultimately irrelevant to the case, as the appellants there did not even allege facts establishing a conflict of interest. (*Id.* at pp. 701, 715.)

The defendants, in sum, rely on one case that summarized Delaware law, and another case that, in dictum, summarized a case that summarized Delaware law. Belatedly recognizing this heavy reliance on Delaware law after oral argument, the defendants submitted a postargument letter asserting that California courts "may properly rely on corporate law developed in the Sate of Delaware given that it is identical to California corporate law for all practical purposes." (*Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 586, fn. 5.) But even if that were true, it would not favor the defendants' argument.

To begin, even under Delaware law, the defendants' position would fail. Under Delaware law, courts apply " 'enhanced' " scrutiny—the type of scrutiny the defendants' request here—in a narrow set of cases; specifically, " 'whenever the record reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effectiveness which touches on issues of control.' " (*Gantler v. Stephens* (Del. 2009) 965 A.2d 695, 705.) But they apply "even more exacting scrutiny" when there is evidence of "actual self-interest" that "affects a majority of the directors approving a transaction." (*Paramount Communications Inc. v. QVC Network Inc.* (Del. 1994) 637 A.2d 34, 42, fn. 9.) And it is the latter scenario, not the former, that describes the

13

facts of our case. Under those circumstances, the directors must prove the "entire fairness" of the transaction—a test requiring directors to "demonstrate both their utmost good faith and the most scrupulous inherent fairness of transactions in which they possess a financial, business or other personal interest which does not devolve upon the corporation or all stockholders generally." (*Mills Acquisition Co. v. MacMillan, Inc.* (Del. 1989) 559 A.2d 1261, 1280; see *Weinberger v. UOP, Inc.* (Del. 1983) 457 A.2d 701, 710 ["When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain"].)

California law, more importantly, demands the very same of majority directors who approve transactions while operating under a material conflict of interest. Directors faced with such divided loyalties must show the approved transaction was "fair and reasonable"—meaning they must not only " 'prove the good faith of the transaction but also . . . show its inherent fairness from the viewpoint of the corporation and those interested therein. [Citation.]' " (*Tenzer, supra*, 39 Cal.3d at pp. 31-32; *Heckmann, supra*, 168 Cal.App.3d at pp. 127-128.) And again, we find the trial court fairly captured this requirement in concluding the Eskaton-affiliated directors, because of their conflict of interest, had the burden to show their approved assessments were "just and reasonable." The defendants here, however, never made this showing.[4]

---

[4] Although the defendants never contend the directors' actions were inherently fair, they at least assert the directors acted in good faith. But even there, we question whether their showing could be found sufficient. To demonstrate good faith, the defendants rely principally on two points. First, they contend the California Department of Real Estate's approval of the creation of the Association (including its management structure) "demonstrates the requisite element of good faith." But that the department initially approved the creation of the Association does not show the Association's directors later governed the Association in good faith. Second, the defendants contend the trial court itself found their appointed directors "did nothing worse than make honest mistakes." But the court only found that Coley failed to show these directors were "motivated by

14

Finally, as an alternative argument, the defendants argue that the Eskaton-affiliated directors had no improper conflict of interest at all, relying on *Lexin v. Superior Court* (2010) 47 Cal.4th 1050 (*Lexin*). But *Lexin* offers them no support. The court in *Lexin* considered whether six city officials who voted on a matter that affected their government pension benefits violated Government Code section 1090—a statute barring public officials from being personally financially interested in the contracts they form in their official capacities. (*Lexin, supra*, 47 Cal.4th at p. 1062.) It ultimately concluded most did not as a matter of law in light of a statutory exception to Government Code section 1090 that applies when the official's financial interest is the same as the official's constituency. (*Lexin, supra*, 47 Cal.4th at pp. 1063, 1094.) As the court explained, although the charged officials were financially interested in the matter, their interest was shared by "thousands of their fellow retirement system members." (*Id.* at p. 1063.)

But the defendants here can point to no similar statutory exception to absolve them of their conflict. Nor would it matter if they could. The city officials in *Lexin* voted on a matter that affected them and their constituents in similar ways. For that reason, the court found, "the financial interest in question is not personal to an employee or official because it is shared with like members of the public agency's constituency." (*Lexin, supra*, 47 Cal.4th at p. 1095.) But the same cannot be said of the Eskaton-controlled directors. Their financial interest was personal and distinct from that enjoyed by the Association members generally. As the trial court explained, the directors' incomes were tied in part to the financial performance of Eskaton Village—incentivizing the directors to shift costs from Eskaton Village to the Patio owners. And that is what they ultimately did, to the benefit of the Eskaton entities and the detriment of the Patio owners.

_____

specific self-interest." It never made an affirmative finding that the directors in fact acted in good faith.

15

C.    *Assessments for Security Services*

The defendants next contend the trial court wrongly found that the Association, under its CC&Rs, was required to allocate the cost of providing security services equally between the Patio owners and Eskaton Village.  Under the defendants' interpretation of the CC&Rs, the Association was free to shift a greater percentage of the cost of these services onto the Patio owners.  We disagree.

We start with the relevant standard of review.  We employ the same rules of interpretations and standards of review for CC&Rs as for contracts and other writings.  (See *Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1377.)  We thus generally review de novo a trial court's interpretation of a homeowners association's CC&Rs, as the meaning of the writing is a question of law.  (See *ibid.*; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866.)  Although true, as Coley notes, the standard of review may become more deferential in the event the parties have offered conflicting extrinsic evidence to aid in the interpretation of the writing (see *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747), the trial court's decision here did not turn on its review of any conflicting extrinsic evidence.  Our review is thus de novo.

The parties' arguments involve competing interpretations of the CC&Rs' references to the assessment "amount" and the assessment "rate."  The CC&Rs explain, in a section titled "Regular Assessments," that the Association board may annually modify "the *amount* of the maximum annual assessment against each [Patio home] or [Lodge residence.]"  (Italics added.)  And they add, in a later section titled "Rate of Assessment," that "assessments shall be fixed at a *rate* for all [Patio homes] and [Lodge residences] as set forth in the Budget initially approved by the Department of Real Estate."  (Italics added.)  In the defendants' view, "amount" and "rate" are synonyms—both refer to the monetary sum of the assessments, which the Association is free to modify.  But in Coley's view, the two are distinct—the "amount" is the monetary sum of the assessment, which the Association may modify; but the "rate" is the percentage

16

allocation of the assessment amount, which is "fixed" at the rate set in the Association's initial budget. Because the Patio owners' percentage responsibility for provided security services was set at 50 percent in the Association's initial budget, Coley contends, the Association violated the CC&Rs in increasing this rate to 83 percent.

We find Coley's interpretation to be the better one. We thus conclude, like the trial court, that the *amount* refers to the monetary sum of the assessments and the *rate* refers to the Patio owners' and Eskaton Village's percentage responsibility for this amount. This conclusion follows from several considerations.

We begin with the term "amount" as used in the CC&Rs. As all parties appear to acknowledge, the "amount of the maximum annual assessment" refers to the monetary sum of the assessment. That reading is consistent with the term's definition as "the total number or quantity." (See Merriam-Webster Dict. (online ed. 2020) <https://www.merriam-webster.com/dictionary/amount> [as of May 26, 2020], archived at https://perma.cc/KXN8-53M9; see also Civ. Code, § 1638; *Cohn v. Cohn* (1942) 20 Cal.2d 65, 69 ["Terms used in a written contract are to be construed according to the ordinary and usual meaning of the language unless an intent that they should be interpreted otherwise plainly appears"].) It is also consistent with the use of the term throughout the CC&Rs. The Regular Assessments section, for example, refers to the "amount of the maximum annual assessment," and the subsequent "Special Assessments" section refers to the "amount of funds" and the "amount necessary to defray [certain] expenses"—all uses consistent with the term "amount" reflecting a monetary sum.

We next turn to the meaning of the term "rate" as used in the CC&Rs. "The term 'rate' when referring to amounts has two distinct meanings. One is a measured quantity of something, that is, a specific amount ('my rate for legal services is $200 an hour'). The other is a measure of a part to a whole, that is, a proportion ('the tax rate is 60%'). *See* Webster's Third New International Dictionary 1884 (1986)." (*Wulff v. Office of Personnel Management* (Fed. Cir. 1998) 133 F.3d 880, 883; see also Black's Law Dict.

17

(10th ed. 2014) p. 1452, col. 1 [defining "rate" as either a "proportional or relative value" or "an amount paid or charged for a good or service"].)

Applying the first definition here (a "measured quantity of something") would make "rate" synonymous with "amount"—an interpretation the defendants favor. But that reading would insert an inconsistency in the CC&Rs. The *amount* of the assessment, for example, can be modified annually; but the *rate* of the assessment is "fixed" at the rate initially set. If we found the two terms were synonyms, we would be left with conflicting pronouncements in terms of whether the assessment amount could in fact be modified.

Applying the second definition of "rate" ("a measure of a part to a whole"), in contrast, avoids this potential conflict, and is thus favored if otherwise reasonable. (*Prudential Realty & Finance Co. v. Clarewood Co.* (1960) 187 Cal.App.2d 320, 322 (*Prudential Realty*) ["The rule is that in the absence of such absolute inconsistency the separate portions should be reconciled if reasonably possible"]; see also Civ. Code, §§ 1641, 1643.) Under that definition, assessments for the Patio owners and the Lodge residents would be "fixed" at some percentage (i.e., at some "measure of a part to a whole")—a reading suggesting the Patio owners would pay some percentage of the assessment total and Eskaton Village (as owner of the Lodge residences) would pay the remaining percentage.

Review of the parties' offered extrinsic evidence supports this reading. The Association's initial budget is perhaps most instructive on this topic. According to the CC&Rs, the Association's board would submit to the Department of Real Estate an initial budget setting forth the "amount" of the assessment and the "rate" of the assessment. Consistent with "amount" being the monetary sum and "rate" the percentage allocation, the board submitted an initial budget, together with a document titled "Homeowner Expense Allocation for Eskaton Services," that listed two types of figures: the monetary sum of the Association's various assessments and the Patio owners' percentage

18

responsibility for these expenses.  The Homeowner Expense Allocation for Eskaton Services, for example, noted the Association would provide "Security/Emergency Response" services, estimated the annual cost of these services to be $103,784, and explained the Patio owners would be responsible for 50 percent of this amount—with Eskaton Village responsible for the balance.

The Association's subsequent budgets further support this reading of "amount" and "rate."  "The rule is well settled that where a contract is ambiguous, the court may consider the subsequent conduct of the parties for the purpose of discovering their intent in entering into a contract."  (*Western Medical Enterprises, Inc. v. Albers* (1985) 166 Cal.App.3d 383, 391.)  And here, consistent with the amount being modifiable and the rate not, the assessment *amount* (i.e., the monetary sum of the assessments) rose over time, but the assessment *rate* (i.e., the percentage allocation of the assessments) remained constant—at least until 2013, when the board raised the Patio's share of the security expenses from 50 percent to 83 percent.

Finally, we find significant the defendants' previous characterization of the assessment rate as a "percentage allocation"—a characterization the defendants now eschew.  According to the defendants in one of their trial briefs, the Rate of Assessment "provision in the CC&Rs refers to a percentage allocation."  We agree.

On appeal, the defendants offer several arguments to support their contrary reading of the CC&Rs, but we find none persuasive.

First, they contend the CC&Rs' Regular Assessments section specifically recognizes the board's ability to modify the Patio owners' and Eskaton Village's relative responsibilities for assessments.  In support, they point to language that the board may annually determine "the amount of the maximum annual assessment against each [Patio home] *or* [Lodge residence]."  In their view, the use of "or" rather than "and" shows the board can in fact "*change the Patio-to-Lodge ratio*—by changing the amount of the assessment against *either* the Patio residences *or* the Lodge residences, *but not both*."

19

This reading would impose a nonsensical limitation on the board's powers—the board would be required to elect in any given year between modifying the assessments on the Patio homes *or* the Lodge residences, and for no good reason, would be prohibited from modifying the assessments on both in a single year. Moreover the defendants' interpretation would mean the board has repeatedly violated the CC&Rs in past years by simultaneously raising the total assessments owed by *both* the Patio homes and the Lodge residences. This nonsensical reading is avoided by construing "or" here to mean "and"—so that in any given year, the board may modify the assessments for both the Patio homes *and* the Lodge residences. That reading avoids the absurdity inherent in the defendants' contrary proposal. (See *Arnold v. Hopkins* (1928) 203 Cal. 553, 563 [finding "the word 'or' must be given the meaning of 'and' " and noting the frequent misuse of the two words]; *Bennett v. Potter* (1919) 180 Cal. 736, 740 [a contract's "language does not of necessity govern its interpretation if it involves an absurdity"].)

Second, the defendants contend the term "rate" (as used in the Rate of Assessment section) and the term "amount" (as used in the Regular Assessments section) should be interpreted synonymously to denote a monetary sum. But it would seem odd to place two sections concerning the very same thing (i.e., the total monetary sums that could be assessed), in separate areas of the CC&Rs under different headings. More importantly, as we note earlier, if "amount" and "rate" were synonyms, that would make the Regular Assessments and Rate of Assessment sections inconsistent. In the former, the CC&Rs provide that the *amount* charged the Patios and Villages may be changed annually; but in the latter, the CC&Rs state the *rate* "shall be fixed" at the rate set in the board's initially approved budget. We decline to accept an interpretation that would create an unnecessary conflict. (See *Prudential Realty, supra*, 187 Cal.App.2d at p. 322; see also Civ. Code, §§ 1641, 1643.)

Finally, the defendants offer an alternative argument in the event we conclude the term "rate" references a percentage allocation. In that event, they suggest the "rate" of

20

assessments refers to the Patio owners' and Eskaton Village's percentage responsibility to contribute to the overall budget, not their percentage responsibility to contribute for specific services. They contend, for example, that Eskaton Village has always contributed 51 percent of the overall funds in the common budget and the Patio owners have always contributed the remaining 49 percent, in accordance with the 137-to-130 ratio of Lodge-to-Patio residents. But even if that overall ratio is accurate, the CC&Rs plainly contemplate that the rate for assessments would be described in the Association's initial budget; and although the initial budget described the Patio owners' percentage responsibility for specific services (including "Security/Emergency Response" services), the defendants offer nothing to show it also described their discussed 51-49 overall ratio. We thus cannot say the CC&Rs' reference to the assessment "rate" refers to this 51-49 ratio.

In sum, considering the text of the CC&Rs and the offered extrinsic evidence, we conclude the assessment "rate" refers to the Patio owners' and Eskaton Village's percentage responsibility for the assessment amount. And because this "rate" was "fixed" at the rate set in the Association's initially approved budget, the Association's board cannot adjust this rate under the current CC&Rs. The board thus erred in adjusting the assessments for security services from a 50-50 allocation rate, as set in the Association's initial budget, to an 83-17 allocation rate.

D.     *Assessments for Legal Fees*

The defendants next assert the trial court wrongly found the Association could not—using what is known as a "Cost Center" under the CC&Rs—assess the Patio owners alone for certain legal fees associated with this suit. We disagree; the trial court was correct.

The Association has two operating budgets: a common budget—which Eskaton Village and the Patio owners fund—and a "Cost Center" budget—which the Patio owners alone fund. The Association's CC&Rs define a "Cost Center" as "a designation assigned

21

by the Association to a discrete portion of the [Patio] Development . . . to be created when the Association is maintaining Common Areas or facilities located within the designated Cost Center area." The question here is whether the Association's board can create a Cost Center to cover legal fees. We conclude it cannot.

The CC&Rs limit the use of Cost Centers to maintenance activities affecting certain parts of the Patio development. That is clear from the definition of Cost Center as something "to be created when the Association is maintaining Common Areas or facilities located within the designated Cost Center area." And it is clear from the CC&Rs' later discussion of a Cost Center as something to "be designated to fairly allocate the expenses incurred or to be incurred by the Association to operate, maintain, repair and replace a particular Common Area Improvement(s) or maintenance areas." Because the legal fees here do not fall within the ambit of maintenance activities, we conclude, like the trial court, that the board erred in creating a Cost Center to cover these fees.

The defendants offer three counterarguments to support a different interpretation, but we find none convincing. They first note that although the CC&Rs discuss the use of Cost Centers for maintenance activities, they also state that a Cost Center may be designated when certain Patio homeowners are receiving "services" in addition to or significantly greater than those provided to other Patio owners or Lodge residents. That is true, but the discussion of these "services" must be understood in context. The CC&Rs define a Cost Center as something "to be created when the Association is *maintaining* Common Areas or facilities located within the designated Cost Center area" (italics added), and then later note, as an example, that a Cost Center may be appropriate when certain Patio owners "are receiving services from the Association that are in addition to, or significantly greater than the services provided to other Owners or residents." The definition of "Cost Center" informs the scope of "services" that may be covered by a

Cost Center—and these "services," which are thus concerned with maintenance activities, do not include the legal services here.

Second, the defendants argue that although Cost Centers may be used for maintenance, that should not be to the exclusion of other uses. In support, they note the Association's initial budget included Cost Centers for security and emergency services, a fitness/wellness program director, and a recreation coordinator—even though none of these services concerned maintenance. But the defendants' cited evidence, the Homeowner Expense Allocation for Eskaton Services, does not show that a Cost Center was created for any of these services. To the contrary, the referenced allocation sheet appears to show that each of these services was covered by the common budget, with the Patio owners sharing the costs of these services with the owner of the Lodge residents (i.e., Eskaton Village).

Third, the defendants claim that language in the CC&Rs allows "the use of the cost center 'for any purpose' "—even for prohibited purposes—as long as the use is "disclosed and supported by 'documentation.' " But the defendants' argument is based on half of a sentence in the CC&Rs, the whole of which must be considered. The cited sentence provides the following in full: "*The use of Cost Center Budget monies is restricted* and documentation shall be required to disclose such use for any purpose other than as intended by this Declaration." (Italics added.) The defendants' contention that the board's use of Cost Budget funds is effectively unrestricted, based on a sentence that expressly provides that use of these "monies *is* restricted" (italics added), is not a persuasive one.

Finally, as an alternative argument, the defendants contend that even if the board wrongly assessed legal fees to the Cost Center budget rather than the common budget, the court miscalculated the fees owed Coley for this error. We agree with the defendants on this point. Coley alleged that if these legal fees had been assessed against the common budget instead of the Cost Center budget, he would have paid $152 less in 2015 and

23

$55.93 per month less in 2016. The trial court agreed the Association wrongly assessed legal fees against the Cost Center budget, but for whatever reason, focused only on the assessments in 2015. In that year, Coley testified, the Association charged each homeowner $204 "in one payment due in November" for legal fees—an amount he contended was $152 too much. The court, however, found this entire $204 "one-time assessment . . . was both excessive and should not been a cost-center item," and thus awarded damages in that amount. But as the defendants contend, the court instead should have awarded Coley damages of $152 for 2015 (the amount he overpaid) and not $204 (the total amount he paid). As to appropriate damages for 2016, we offer no opinion as neither party has raised this issue.

E. *Damages for Murch's Disclosure of Privileged Records*

The defendants next contend the trial court wrongly awarded Coley damages of $917.88 based on Murch's violation of the attorney-client privilege. The defendants reason that no evidence shows Coley was harmed in this amount. We agree.

The facts concerning Murch's violation of the attorney-client privilege are straightforward. The Association's attorneys advised the Association on matters relating to this litigation. Murch then, in the course of the trial, shared this information with his counsel and the Eskaton entities' counsel.

In light of this conduct, Coley amended his complaint to add a new cause of action against Murch for breaching his fiduciary duty to the Association. He then requested damages covering his share of attorney fees that the Association paid its counsel (and that the Patio owners indirectly paid through assessments) for the time spent objecting to the introduction of evidence on this topic. To calculate these damages, however, Coley considered his share of attorney fees that the Association paid its counsel for the *entire* trial, not merely for those moments spent on this particular subject. And the court ultimately accepted Coley's calculation.

24

We find the court erred in this regard.  Compensatory damages " 'need not be calculated with absolute certainty,' " and even an " 'approximation' " may be fine. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774.)  But the law does require " 'that some reasonable basis of computation of damages be used.' "  (*Ibid*.)  And we do not find this baseline requirement of reasonableness satisfied here.  The trial here spanned 12 days and covered a variety of topics—most in more detail than this one.  The Association's objections concerning this issue, for example, appear to have covered just 10 pages in a 1,388-page reporter's transcript—less than 1 percent of the total.  Yet Coley used the small fraction of time spent on Murch's conduct to obtain reimbursement for the whole of the trial.  That was too much.

Coley's several arguments in favor of a contrary conclusion miss the mark.  First, he suggests the defendants forfeited this issue by failing to bring it to the trial court's attention.  But even assuming the defendants never raised this particular issue below, they could still argue on appeal that the court's finding was not supported by substantial evidence.  (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17 ["Generally, points not urged in the trial court cannot be raised on appeal.  [Citation.]  The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule"].)

Second, Coley contends the award of $917.88 could be considered nominal damages—rather than compensatory damages—and affirmed for that reason.  But that is not what Coley sought below.  Nominal damages may be appropriate "[w]hen a breach of duty has caused *no* appreciable detriment."  (Civ. Code, § 3360, italics added.)  Coley, however, contended below that he and his fellow Patio owners suffered damages of an "appreciable" amount as a result of Murch's disclosure:  $917.88 for him individually and $119,324.44 for the Patio owners as a whole.  And he sought *actual* damages, not nominal damages, to compensate for these losses.  Coley cannot now retain these damages by characterizing them as nominal.  "By nominal damages is meant some

25

trifling sum, as a penny, one cent, six cents, etc." (*Davidson v. Devine* (1886) 70 Cal. 519, 520 (*Davidson*); see also *Broads v. Mead* (1911) 159 Cal. 765, 769 ["one hundred dollars is a substantial recovery and does not come within the definition of nominal damages"].) Damages of $917.88 do not fit that definition. Nor, certainly, do damages of $119,324.44.

F.      *Attorney fees*

Finally, the defendants claim the court abused its discretion in awarding Coley $654,242.53 in attorney fees.

Under Civil Code section 5975, a trial court must award attorney fees and costs to the prevailing party in any action to enforce the CC&Rs of a common interest development. Based on this authority, the trial court here awarded Coley attorney fees in the amount of $654,242.53—a figure that covered all Coley's attorneys' hours for the case.

The defendants accept that Coley was entitled to some attorney fees, but contend the court's awarded amount was excessive for three separate reasons. First, they claim the award was "grossly disproportionate" to the limited damages that Coley obtained. Second, they allege the court erred in failing to exercise its discretion to apportion the fees between causes of action that warranted attorney fees and those that did not. And third, they contend the court wrongly ignored their request to apply a negative multiplier to Coley's requested attorney fees in light of his limited success in the litigation. As an alternative argument, the defendants assert that even if the awarded fees were not excessive, we should still remand to allow the trial court to reconsider attorney fees in the event we find any portion of the damages award should be reduced. We consider each of these arguments in turn.

1. *Degree of success*

We consider first the defendants' argument that the award of attorney fee was excessive given the limited damages Coley obtained.

26

Under California law, a prevailing party's degree of success is one of several factors to be considered before awarding attorney fees.  As the California Supreme Court has explained, " '[t]he trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, *the success or failure*, and other circumstances in the case.'  [Citation.]"  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096, italics added; see also *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989-990 (*Chavez*) ["Although fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims [citation], 'under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success' [citations]"].)  A trial court's determination of reasonable attorney fees after considering these several factors is reviewed for abuse of discretion.  (*PLCM Group, supra*, 22 Cal.4th at p. 1096.)

Relying on this precedent, and specifically *Chavez*, the defendants contend the disparity between the awarded damages ($2,328.51) and the awarded attorney fees ($654,242.53) warrants reversal of the trial court's judgment.  But a large disparity between a damages award and an attorney fees award is not reason enough to find a trial court abused its discretion.  *Chavez* itself acknowledged that "attorney fees need not be strictly proportionate to the damages recovered" under federal law, and that California law is "consistent."  (*Chavez, supra*, 47 Cal.4th at p. 989.)  And lower appellate courts have repeatedly rejected claims that fee awards must be proportional to damages award— even when the fee award is over 80,000 times more than the damages award.  (See *Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 987 [trial court did not abuse its discretion in awarding attorney fees that were 87,525 times more than awarded damages]; see also *Concepcion v. Amscan Holdings, Inc.* (2014) 223 Cal.App.4th 1309, 1321 ["attorney fee award [granted under the Song–Beverly Credit Card Act] need not bear any specific relationship to the dollar amount of the

27

recovery"]; *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1251 [rejecting the appellant's claim that attorney fees granted under the California Fair Employment and Housing Act were excessive because they were not proportional to the awarded damages]; *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 421 ["There is 'no mathematical rule requiring proportionality between compensatory damages and attorney's fees awards' "].)

Consistent with *Chavez* and our fellow appellate courts, we reject the defendants' contention that an award for attorney fees must be proportional to the award for damages. In arguing otherwise, the defendants assert that *Chavez* "disapproved" of a fees-to-damages ratio of 76-to-1, and so naturally a ratio of 281-to-1 should also fail. But the *Chavez* court never "disapproved" of a fees-to-damages ratio of any amount. It instead affirmed the trial court's decision not to award fees at all. (*Chavez, supra*, 47 Cal.4th at p. 991.) The court's reasoning was twofold and had nothing to do with any fees-to-damages ratio. First, it found that because the plaintiff was successful on only one claim that "apparently was not closely related to or factually intertwined with plaintiff's many unsuccessful claims, the trial court reasonably could and presumably did conclude that plaintiff was not entitled to attorney fees for time spent litigating those unsuccessful claims." (*Id.* at p. 990.) Second, as to that one successful claim, it found the trial court had grounds to refuse fees altogether for two independent reasons: (1) because the plaintiff's attorney fee request on its one successful issue was "grossly inflated," and (2) because the plaintiff's case should have been brought as a limited civil case, which would have limited the length and cost of the case. (*Id.* at pp. 986, 991.)

But the defendants here raise no similar arguments. They do not contend that the fee request here was "grossly inflated" or that this case should have been brought as a limited civil case. Nor do they allege that Coley's successful claims were "not closely related to or factually intertwined with [his] many unsuccessful claims." They instead

28

raise an argument solely based on the ratio of fees to damages—an argument never accepted in *Chavez* and consistently rejected by other courts.

Although true that fee awards may be reduced based on a prevailing party's limited success, a high fee-to-damages ratio is simply not sufficient in itself to show a trial court abused its discretion. A ratio of this sort, to be sure, may be highly relevant in evaluating a party's success in certain cases when paired with other considerations. But it may be of marginal relevance in other cases. That would be true, for example, when a high fee-to-damages ratio reflects more the other party's unreasonable tactics than the degree of the prevailing party's success. And it would be true, as another example, when the damages award fails to reflect fully the public benefit advanced by the litigation—a consideration particularly relevant under the facts here. Like the court below, we find relevant "that the hours [Coley's attorneys] spent establishing liability 'paved the way' for recovery of similarly situated plaintiffs." Coley filed a class action to benefit all similarly situated Patio owners, and from that perspective, the damages he obtained is more impressive. True, Coley was awarded only $2,328.51; but the potential stake is 130 times greater. The potential stake, in other words, is $302,706.30—or at least somewhat near that; as noted in Parts I.D. and I.E. of this opinion, some of the damages the trial court awarded Coley will need to be reduced on remand.

### 2. *Apportionment of fees*

We consider next the defendants' claim that the "trial court erred in failing to *apportion* fees between causes of action on which attorney's fees were recoverable and causes of action on which attorney's fees were not recoverable."

In its decision on the award of attorney fees, the trial court found apportionment was "not warranted" because "the factual issues between fee-eligible and non-fee eligible claims were inextricably intertwined." In the defendants' view, that was error. They reason that "[t]he mere fact that issues are intertwined is not a reason to deny apportionment." In support, they cite *El Escorial Owners' Assn. v. DLC Plastering,*

*Inc.* (2007) 154 Cal.App.4th 1337—a case recognizing that "[a] court may apportion fees even where the issues are connected, related or intertwined." (*Id.* at p. 1365.)

The defendants' contention is misplaced. Although trial courts have discretion to apportion fees even when issues are intertwined (unless the issues are impossibly intertwined), they also have discretion to decline to do so. Indeed, as the California Supreme Court has several times recognized, the fact that issues are intertwined is reason enough to decline to apportion fees. In *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124 (*Reynolds Metals*), for example, the court explained "[a]ttorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Id.* at pp. 129-130.) And in *Chavez*, the court went further in suggesting this was the default rule, noting that "fees are *not* reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims." (*Chavez, supra*, 47 Cal.4th at p. 989, italics added.) In doing so, the court cited with approval *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413—a case that affirmed a trial court's finding that "apportionment of fees was not appropriate because the 'issues in the case were common to one another and . . . intertwined . . . .' " (*Id.* at p. 431; see also *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 687 ["Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units"].)

Consistent with this precedent, we decline to find the trial court's decision not to apportion warrants reversal. Because a court "need not" apportion fees "when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed" (*Reynolds Metals, supra*, 25 Cal.3d at pp. 129-130), we find no abuse of discretion in the trial court doing just that.

30

### 3. Negative multiplier

We next consider the defendants' claim that the court "failed to adjudicate whether to apply a negative multiplier to account for Coley's lack of success on the majority of his claims."

In their opposition to Coley's request for attorney fees, the defendants contended the amount of attorney fees should be reduced for two separate reasons. First, they argued the court should apportion fees between claims that were fee eligible and claims that were not. Second, they asserted the court should reduce the fee award to account for Coley's limited success. But according to the defendants, the trial court mistakenly conflated these two arguments and considered only the defendants' apportionment argument.

We disagree. The trial court recognized and rejected both the defendants' arguments. It first noted the defendants' principal argument in opposition to Coley's fee request "concern[ed] the application of multipliers." It afterward noted the defendants "further argue[d] that [Coley's] fees should be apportioned based on the fact that [Coley] prevailed on only two causes of action for which attorney's fees are available." But the court ultimately rejected both of these arguments for distinct reasons. It rejected the defendants' apportionment argument because, as discussed above, it found the "fee-eligible and non-fee eligible claims were inextricably intertwined." And it rejected the defendants' limited-success argument after considering the facts in favor of a positive multiplier and those in favor of a negative multiplier. On the one hand, the court noted "the factor weighing most heavily in favor of a multiplier in this case is that the hours spent establishing liability 'paved the way' for recovery of similarly situated plaintiffs." On the other hand, the court acknowledged the defendants' argument that Coley "achieved only limited success, prevailing on only three of twelve distinct claims and

31

receiving only a small fraction of the damages he sought on his own behalf."[5] But in the end, the court found these competing considerations canceled one another out and "decline[d] to apply any multiplier." We find no error in its doing so.

### 4. *Reconsideration of attorney fees based on reduced damages award*

Finally, we consider the defendants' argument that even if the awarded fees were not excessive, we should still remand to allow the trial court to reconsider attorney fees in the event we find the damages award should be reduced. We agree.

As discussed in Parts I.D. and I.E. *ante*, some of the damages the trial court awarded Coley will need to be reduced on remand. Because of this reduction in damages, we find the trial court should consider on remand whether the awarded attorney fees should also be reduced.

## II. *Coley's Cross-Appeal*

### A. *Murch's and Donovan's Liability*

Coley, in his cross-appeal, first contends the trial court should have found Murch and Donovan liable in their personal capacities. The trial court declined to do so because it concluded "the evidence failed to establish (1) conduct by the majority directors was motivated by specific self-interest; (2) the individual directors benefited from their breach of fiduciary duty or (3) that the actions of the directors amounted to mismanagement of the HOA." According to Coley, the court erred in requiring this showing; it was enough, he maintains, that he showed (1) the directors had a fiduciary obligation to him and other Patio owners, (2) they breached this duty by approving transactions—while acting under a material conflict of interest—that were unfair to Coley and other Patio owners, and (3) Coley suffered damages as a result of this breach. We agree.

---

[5] The trial court actually agreed in part with six, not merely three, of Coley's twelve causes of action, but it found only three of these causes of action supported an award of damages.

32

The trial court correctly set out the three elements of the cause of action at issue: existence of a fiduciary relationship, breach of fiduciary duty, and damages. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis West Realty*).) And as it further explained, the directors of a nonprofit mutual benefit corporation, like the Association here, are fiduciaries who must act for the benefit of the corporation and its members. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 513 (*Frances T.*) ["Directors of nonprofit corporations . . . are fiduciaries who are required to exercise their powers in accordance with the duties imposed by the Corporations Code"]; *Cohen v. S & S Construction Co.* (1983) 151 Cal.App.3d 941, 945 ["This fiduciary duty extends to individual homeowners, not just the homeowners association"].)

The court also correctly applied these principles to the facts. It found the directors Murch and Donovan owed a fiduciary duty to the Association and its members—satisfying the first element for breach of fiduciary duty. It then concluded they breached their fiduciary duties by voting, inconsistent with the CC&Rs, to (1) raise the Patio owners' share of the security services from 50 percent to 83.3 percent, and (2) require the Patio owners alone, and not also the Lodge owners, to cover certain legal fees—satisfying the second element. It found Murch further breached his fiduciary responsibility by disclosing the Association's privileged communications with its counsel. Finally, the court found Coley suffered damages as a result of the directors' breaches of their fiduciary duties—satisfying the third and final element for breach of fiduciary duty.

Each of these findings were supported by substantial evidence. First, as all parties accept, Murch and Donovan owed a fiduciary duty to Coley and other Patio owners. (See *Frances T., supra*, 42 Cal.3d at p. 514; *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108-110.) Second, substantial evidence supports the court's finding that Murch and Donovan breached this duty. As fiduciaries, Murch and Donovan were bound not to approve a transaction in which they had a material financial interest unless that

33

transaction was "fair and reasonable"—meaning the transaction was entered in " 'good faith' " and was " 'inherent[ly] fair[] from the viewpoint of the corporation and those interested therein.' " (See *Tenzer, supra*, 39 Cal.3d at pp. 31-32; see also *id.* at p. 32 [discussing "the standards of fairness and good faith required of a fiduciary" in cases involving potential self-dealing]; *Jones, supra*, 1 Cal.3d at pp. 110, 112 [majority shareholders owe a fiduciary duty of "good faith and inherent fairness to the minority in any transaction where control of the corporation is material"; this "comprehensive rule of 'inherent fairness'" also applies to directors who engage in transactions that conflict with their duty to shareholders]; *Heckmann, supra*, 168 Cal.App.3d at pp. 127-128.)

But they failed to meet this standard. Even if the directors required the Patio owners to pay a greater share of the security-services fees and legal fees in good faith—which is debatable (see fn. No. 4, *ante*)—it could not be said that their doing so in violation of the CC&Rs was fair from the viewpoint of the Patio owners. Nor do we find Murch's disclosure of the Association's privileged communications was fair from the Patio owners' perspective. Finally, substantial evidence supports the court's finding that Coley and similarly situated Patio owners suffered damages as a result of these breaches—though, as discussed *ante* in Parts I.D. and I.E., some of the awarded damages must be adjusted downward.

Although the trial court found the directors breached their fiduciary duties, it declined to find them personally liable, reasoning in a prejudgment order that something more is required before the directors may be found personally liable for their misconduct. In the court's view, Coley needed to show, in addition to the directors' breach of their fiduciary duties, that they acted in self-interest, benefited from their breach of fiduciary duty, and mismanaged the Association.

This was error. Once Coley established the existence of a fiduciary relationship, breach of fiduciary duty, and damages, he was entitled to damages absent some applicable affirmative defense. (See *Meister v. Mensinger* (2014) 230 Cal.App.4th 381,

395-397 [" 'Where a breach of fiduciary duty occurs, a variety of equitable [and legal] remedies are available' "]; see also *Oasis West Realty, supra*, 51 Cal.4th at p. 820 ["The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages"]; *Frances T., supra*, 42 Cal.3d at pp. 503-504 [corporate directors and officers may be liable for corporate wrongs when they " 'authorize[], direct[], or in some meaningful sense actively participate[] in the wrongful conduct' "].)  As we have explained, although the common law business judgment rule may generally provide a director with immunity for decisions made in good faith, such immunity does not apply when, as here, the director is acting under a material conflict of interest.

In demanding more from Coley before awarding damages, the court asked for too much.  The court first faulted Coley for failing to show the "conduct by the majority directors was motivated by specific self-interest."  But even if the directors were not "motivated by specific self-interest," and even if they acted in good faith, that would not be reason enough to avoid liability.  Again, considering the directors' material conflict of interest in the transactions they approved, they were required " 'not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.' [Citation.]" (*Tenzer, supra*, 39 Cal.3d at p. 32.)  And for reasons already discussed, the directors could not show their challenged actions were fair to Coley and other Patio owners.

The court next took issue with Coley's failure to show "the individual directors benefitted from their breach of fiduciary duty."  But a director may still be liable for damages resulting from his or her breach of fiduciary duties, even if the director did not personally benefit from that breach. (See *St. James Armenian Church of Los Angeles v. Kurkjian* (1975) 47 Cal.App.3d 547, 553 ["where a fiduciary, in breach of his duty of disclosure, causes secret profits to flow to a third party, the fiduciary may be held liable for those profits even though he did not personally receive any part of them"].)  To find

otherwise would absolve directors of liability when they abuse their positions to benefit, for example, friends and family. It would also inappropriately immunize directors who abuse their positions to benefit themselves but fail to succeed for reasons outside their control.

Finally, the court faulted Coley for failing to show "that the actions of the directors amounted to mismanagement of the [Association]." But the directors' failure to comply with the Association's CC&Rs *was* mismanagement—at least to the extent of this failure. It may not have been pervasive mismanagement. It may not have been egregious mismanagement. But an unlawful failure to abide by an association's governing documents is mismanagement to some degree nonetheless.

We find, in sum, the trial court should have found both Murch and Donovan personally liable for any damages resulting from their breaches of their fiduciary duties. We remand to allow the court to determine the amount of these damages consistent with Parts I.D. and I.E. of our opinion. We also remand to allow the court to determine the directors' liability, if any, for Coley's attorney fees.

B.    *Elder Abuse*

Coley next claims the trial court wrongly declined to find the defendants liable for financial abuse of an elder. We disagree.

A person commits financial abuse of an elder by, among other things, taking the property of an "elder"—meaning someone aged 65 or older—either (1) "for a wrongful use or with intent to defraud, or both" or (2) "by undue influence." (Welf. & Inst. Code, §§ 15610.27, 15610.30, subd. (a).) In rejecting Coley's claim for financial elder abuse, the trial court focused on the former prohibition—that is, it considered whether the defendants took Coley's property for a "wrongful use" or with "intent to defraud." And it ultimately concluded they did not. But the court never separately considered whether the defendants took Coley's property "by undue influence," even though Coley raised this specific issue in his pleadings and trial briefs.

36

Coley now faults the court for failing to conduct this "undue influence" analysis, and, on the merits, contends the record shows the defendants in fact took his property by "undue influence." But because Coley never informed the trial court of this deficiency in its statement of decision, his burden on appeal is a difficult one. A party claiming deficiencies in a trial court's statement of decision "must bring such defects to the trial court's attention to avoid implied findings on appeal favorable to the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134; see Code Civ. Proc., § 634.) Coley, however, never notified the trial court that it neglected to address the issue of undue influence, and we thus apply the doctrine of implied findings against him. That is, we presume the trial court found the defendants did not exert any undue influence on him, and consider only whether this implied finding is supported by substantial evidence. (See *Arceneaux, supra*, 51 Cal.3d at p. 1134; *Axis Surplus Ins. Co. v. Reinoso* (2012) 208 Cal.App.4th 181, 195.)

We conclude substantial evidence supports this implied finding. " 'Undue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a).) "In determining whether a result was produced by undue influence," the trier of fact must consider the "vulnerability of the victim," the "influencer's apparent authority," the "actions or tactics used by the influencer," and the "equity of the result." (*Id.*, subd. (a)(1)-(4).)

We start with those considerations favoring Coley. We agree, as Coley contends, that consideration of the "equity of the result" favors his position. And we accept that the defendants' "apparent authority" over Coley also tips in his favor. Evidence of apparent authority may include the actor's "status as a fiduciary" (Welf. & Inst. Code, § 15610.70, subd. (a)(2)), and as discussed above, at least some of the defendants here were fiduciaries.

37

But the trial court reasonably could have found the two remaining considerations strongly counsel against a finding of undue influence. First, we see no evidence at all of Coley's "vulnerability." Second, the trial court could have found consideration of the defendants' "actions or tactics" also disfavored finding any undue influence. To be sure, the defendants' conduct was not blameless. Murch and Donovan, for example, approved Association fees inconsistent with the Association's CC&Rs while having a clear conflict of interest. But even so, the court still could have concluded these actions did not tend to show "undue influence"—that is, they did not tend to show "excessive persuasion that cause[d] another person to act or refrain from acting by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a).) Considering the directors' "actions or tactics," we find it notable that the directors were never shown to have violated the CC&Rs intentionally. Nor were they shown, in the trial court's view, to have been "motivated by specific self-interest." We also find it notable that the challenged actions here concern Murch's and Donovan's approval of generally applicable fees. These fees were not aimed at Coley or anyone else in particular; rather, they applied generally to the owners of the 130 Patio homes and the Lodge owner (Eskaton Village). The trial court reasonably could have found that broad approvals of this sort, approved without self-interest, do not favor finding the taking of an "elder's" property by "undue influence" merely because it is shown some affected persons happen to be 65 or older.

C. *Eskaton Village's Use of the Association's Maintenance Building*

Finally, Coley contends the trial court wrongly rejected one of his derivative claims for breach of fiduciary duty on behalf of the Association—namely, his contention that Murch and Donovan breached their fiduciary duty to the Association by allowing Eskaton Village to use the Association's maintenance building rent free.

A cause of action for breach of fiduciary duty, as discussed above, includes three elements: "[T]he existence of a fiduciary relationship, breach of fiduciary duty, and

38

damages." (*Oasis West Realty, supra*, 51 Cal.4th at p. 820.)  The court below agreed that Coley established the first two of these elements on this claim.  It found Murch and Donovan owed a fiduciary duty to the Association.  And it found they breached this duty, stating that Murch and Donovan failed "to act as required in the best interests of the [Association] by collecting rent from [Eskaton Village]" for its use of the Association's maintenance building.  But the court ultimately found Coley failed to establish damages from this breach and denied his claim for that reason.

Challenging the court's decision, Coley contends the "trial court incontestably found that the [Association] should have received rental income from Eskaton [Village]," and thus it is "incontestable that the [Association] suffered a pecuniary loss."  But although it is certainly plausible that the Association suffered a loss of rental income, it is not incontestable.  Coley offers nothing to show the building was rentable at any amount.  He never showed the Association could have collected rent from Eskaton Village.  Nor did he show the Association could have collected rental income from any other source had Eskaton Village not been using the building.

Coley alternatively contends the court at least should have awarded him nominal damages, even if actual damages were not shown.  He cites, in support, Civil Code section 3360, which provides that "[w]hen a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."  But even if section 3360 were applicable here, we would not reverse on this count merely to allow Coley to obtain a dollar or two in nominal damages.  (See *Davidson, supra*, 70 Cal. at p. 520 ["By nominal damages is meant some trifling sum, as a penny, one cent, six cents, etc."].)  "[T]he general rule is that the failure to award nominal damages is not alone ground for reversal of a judgment or for a new trial."  (*Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 633.)  The one exception is when "nominal damages in the given case would carry costs" or perhaps fees.  (*Kenyon v. Western Union Tel. Co.* (1893)

39

100 Cal. 454, 458-459.)  But Coley seeks only nominal damages for the sake of obtaining nominal damages, and that in itself is not sufficient to warrant reversal.  (*Ibid.*)

DISPOSITION

The judgment is reversed in part and affirmed in part.  We direct the trial court to enter a modified judgment finding Murch and Donovan liable in their personal capacities for their respective breaches of their fiduciary duties.  We also remand to allow the court to recalculate the damages award consistent with Parts I.D. and I.E. of our opinion; to consider whether the awarded attorney fees should be reduced in light of the reduced damages; and to determine Murch's and Donovan's liability for damages and their liability, if any, for Coley's attorney fees.  In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


/s/
RAYE, P. J.



We concur:



/s/
MAURO, J.



/s/
RENNER, J.

40

Filed 7/8/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| RONALD F. COLEY, | C084328 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2014-00171851-CU-MC-GDS) |
| v. | |
| ESKATON et al., | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, David W. Abbott, Judge. Reversed in part and affirmed in part.

Diepenbrock Elkin Gleason, David A. Diepenbrock; Brady & Vinding, Michael E. Vinding and Michael V. Brady for Plaintiff and Appellant.

Horvitz & Levy, Jon B. Eisenberg, Peder K. Batalden; Hefner Stark & Mariois, Kenneth R. Stone, Michael R. Williams; Law Office of Jon B. Eisenberg and Jon B. Eisenberg for Defendants and Appellants.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts IA, IC, ID, IE, IF, IIB, and IIC of the Discussion.

1

THE COURT:

The opinion in the above-entitled matter filed June 11, 2020, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be partially published in the Official Reports, with the exception of parts IA, IC, ID, IE, IF, IIB, and IIC of the Discussion, and it is so ordered.


BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
MAURO, J.


_____/s/_____
RENNER, J.


2